# UNITED STATES *v.* INTERSTATE COMMERCE COMMISSION ET AL.

No. 12.   Argued October 11, 1956.—Decided December 17, 1956.

*Ralph S. Spritzer* argued the cause for the appellant. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Hansen* and *Daniel M. Friedman.*

*Robert W. Ginnane* argued the cause for the Interstate Commerce Commission. With him on the brief was *B. Franklin Taylor, Jr.*

*Windsor F. Cousins* argued the cause for the railroad appellees. On the brief were *Charles P. Reynolds* and *James B. McDonough, Jr.,* for the Seaboard Air Line Railroad Co., *Richard B. Gwathmey* for the Atlantic Coast Line Railroad Co., *A. J. Dixon* and *William B. Jones* for the Southern Railway Co., *John P. Fishwick* for the Norfolk & Western Railway Co., *Martin A. Meyer, Jr.,* for the Virginian Railway Co., and *Hugh B. Cox* and *Mr. Cousins* for the Pennsylvania Railroad Co.

Mr. Justice Reed delivered the opinion of the Court.

This appeal requires a determination of whether railroads serving the port of Norfolk, Virginia, must grant the United States an allowance for the Government's performance of certain wharfage and handling services on its own export freight. For shippers who conform to the requirements of the tariff, the railroads assume these charges as a part of the rate. The United States, however, found it impractical to conform to the tariff requirements.

The present litigation was instituted pursuant to 28 U. S. C. § 2325 in a three-judge District Court of the District of Columbia by the United States, through its Department of the Army, against the Interstate Commerce Commission and the United States, to set aside the Commission's order in *United States* v. *Aberdeen & Rockfish R. Co.,* 289 I. C. C. 49. That order dismissed a complaint filed by the United States on November 20, 1951, against several named railroads charging them with violations of the Interstate Commerce Act. The District Court, one judge dissenting, dismissed the complaint. 132 F. Supp. 34. We noted probable jurisdiction. 350 U. S. 930.

Since May 1, 1951, the railroads have refused to pay an allowance to the Army for the wharfage and handling [1] services the Army performs on military export traffic passing through Army base piers in Norfolk, Virginia. The railroads have assumed in their tariffs the obligation to

[1] "Wharfage refers to the provision of space on the docks for storage of freight pending transfer between freight cars and cargo vessels; handling refers to the unloading of goods from freight cars and placing them on the docks within reach of ship's tackle . . . ." *United States* v. *Interstate Commerce Commission,* 91 U. S. App. D. C. 178, at 182, 198 F. 2d 958, at 962. See *Wharfage Charges at Atlantic and Gulf Ports,* 157 I. C. C. 663, 672.

furnish these accessorial services for all shippers that comply with their tariffs. And, in accordance with these tariffs, the railroads have furnished the services for commercial shippers at public sections of the same piers without additional charge. These services were performed for the Army and the railroads by the same private company—for the Army under contract to carry out its orders for terminal and storage services; for the railroads by contract to act as the carriers' agent in accordance with their tariffs.

The Army sought a determination that the railroads' refusal to make an allowance to it to the same extent that the railroads paid the private company, Stevenson & Young, for handling of private shipments subjected the Government to unjust discrimination and constituted an unreasonable practice in violation of §§ 1, 2, 3, and 6 of the Interstate Commerce Act.[2] The Army also requested

---

[2] "It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs . . . which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful." 49 U. S. C. § 1 (6).

"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust

an order that the railroads cease and desist from such refusal in the future.[3]

The transfer of export freight from rail carriers to outbound water carriers is made on piers or wharves that allow the unloading of freight from railroad cars to within reach of ships' tackle. Railroads are under no statutory obligation to furnish such piers or to unload carlot freight, *Pennsylvania R. Co.* v. *Kittanning Co.*, 253 U. S. 319, 323.[4] In general the railroads have taken on the duty of wharfage and handling for freight consigned for overseas shipment.[5] In some instances railroads have charged for the use of the piers ("wharfage") and the necessary "handling" separately from their charge for

discrimination, which is prohibited and declared to be unlawful." 49 U. S. C. § 2.

"It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject . . . any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever . . . ." 49 U. S. C. § 3 (1).

As §§ 1 (6), 2 and 3 (1) of the Act only are material on this appeal, they alone are quoted in pertinent part.

[3] No reparations were requested in this proceeding. However, as the Government indicates, if the railroads' refusal to pay for wharfage and handling is held to be a violation of the Act, the Government may deduct the prior "overpayments" from future sums due the railroads. See 49 U. S. C. § 66.

[4] See 289 I. C. C., at 61.

[5] They can assume such and similar accessorial services by tariffs approved by the Commission as fair. See *Baltimore & Ohio R. Co.* v. *United States*, 305 U. S. 507, 524. It is discrimination or unfairness in the tariffs that calls for correction. *United States* v. *United States Smelting Co.*, 339 U. S. 186, 194–197. Such determinations are on a case-by-case basis. See, *e. g., United States* v. *Wabash R. Co.*, 321 U. S. 403.

line-haul transportation. In other cases there has been only a single factor export rate (one inclusive charge) providing for limited shipside delivery with the railroad furnishing these accessorial services pursuant to their tariffs at no extra charge to the shipper. The latter practice has been generally followed by railroads serving North Atlantic ports. Where railroads do not have their own piers, they have provided these services by contracting with commercial terminal operators.

## I.

The Norfolk piers, involved in this matter, were managed by such operators. They were built by the United States after World War I and have been leased in part or in whole to a series of commercial operators since then. The leases were cancelled during World War II but they were leased to Stevenson & Young, a private terminal operator, at the end of that war. The railroads here involved, using the single factor shipside rate described above, contracted with Stevenson & Young, as their agent, to perform the wharfage and handling for 25¢ per ton for wharfage and 75¢ per ton for handling, on both commercial and military freight. But with the advent of the Korean hostilities, the Government again cancelled the leases and the Army took entire control of the piers. Apparently the military shipments require special handling and storage. To assure its complete satisfaction, the Army hired Stevenson & Young to perform those services under a general pier-operating contract for the Army.[6]

---

[6] It called for performance of "all terminal and pier warehouse intransit storage services excluding physical plant facilities (piers, warehouses, etc.); all checking and clerking services in connection therewith; all policing (sweeping and cleaning) services; and such other terminal services (excluding vessel checking and stevedoring; watchmen and guard service; utilities and maintenance of premises service) as may be designated herein, and, in connection therewith,

The unused portions of the piers were later released by the Government, by a contract dated December 28, 1951, for the commercial operations of Stevenson & Young. By that contract Stevenson & Young leased the unused parts for 1952 from the United States, for a public commercial maritime terminal. It was over these leased portions of the piers that the lessee carried on its public warehousing activities in accordance with the railroad tariffs.

A typical tariff arrangement appears in the note below. It is the basic exhibit in this case.[7] It was bottomed on

---

. . . [the performance of] all the duties of a terminal operator in such areas of the Norfolk Army Base or at any pier in or about the Hampton Roads harbor area as may be designated by the Contracting Officer . . . ."

[7] "Statement of Excerpts from Penna. R.R. Tariff ICC 3007, Setting Forth the Regulations and the Compensation Which the Penna. R.R. Will Pay to the Norfolk Terminals Division of Stevenson & Young, Inc., for Wharfage Facilities Furnished and Handling Services Performed at Norfolk, Va.

"Rule 47

". . . wharfage and handling charges published in Norfolk and Portsmouth Belt Line Railroad Company Tariff No. 6–J, I.C.C. 105, will be included in the freight rate to or from Norfolk, Va., on Export, Import, Intercoastal and Coastwise freight traffic, any quantity, . . . subject to the following conditions:

"(b) When receipt from or delivery to vessel is in rail service over wharf properties owned or leased by Norfolk Terminals Division of Stevenson & Young, Inc., and operated by Norfolk Terminals Division of Stevenson & Young, Inc., as a public terminal facility of the rail carriers.

[On January 1, 1952, the above rule (b) was changed. As the change strengthened the tariff in favor of the railroads, it is not quoted. See 289 I. C. C., at 59.]

"Compensation

"The Pennsylvania Railroad Company will pay to Norfolk Terminals Division of Stevenson & Young, Inc., as its agent, for wharfage facilities furnished and handling services performed on traffic

a contract of April 5, 1947, between the Pennsylvania Railroad and Stevenson & Young. By that contract Stevenson & Young, as a public wharfinger, agreed to act "as directed by the Railroad" and as its agent for wharfage and handling of "export, import, coastwise and intercoastal freight" in accordance with the tariff upon the facilities it acquired on the Army base. The agent assumed responsibility for freight charges and care of freight in its charge. It agreed, paragraph 4, that:

> "The Terminal [Stevenson & Young] shall provide adequate facilities for the handling and storage of the freight subject to this agreement, shall provide access to the Railroad or its agent, the Norfolk and Portsmouth Belt Line Railroad, for the delivery of cars to and from shipside without interference or

---

described and conforming to the conditions specified above, compensation in the following amounts in cents per 100 pounds, except as otherwise provided.

| | Wharfage | Handling |
|---|---|---|
| "[Generally] | 1¼ | 3¾ or 75 cents per ton |

[There were exceptions.]

"(1)(a) Handling Charges will not be absorbed on freight in open cars, except on lumber, . . . .

"(b) When stowing in open cars is required, handling charge of ½ cent per 100 pounds or 10 cents per 2000 pounds will be absorbed on lumber, all kinds . . . .

"(2)(a) Wharfage and/or handling charges will not be absorbed on freight accorded literage, or on Grain or any other inbound or outbound traffic milled, mixed, malted or stored in transit at the wharf properties operated by Norfolk Terminals Division of Stevenson & Young, Inc., [or numerous other warehouses and terminals].

"(b) In all other respects on Export, Import, Intercoastal and Coastwise traffic, the wharfage, handling, storage and/or other charges applicable at the wharf properties operated by Norfolk Terminals Division of Stevenson & Young, Inc., [or numerous other warehouses and terminals] will be in addition to the rate to and from Norfolk, Va. or Portsmouth, Va., as the case may be, published in tariffs lawfully on file with the Interstate Commerce Commission."

interruption, and shall load and unload cars promptly without delay of freight or railroad equipment."

Paragraph 13 said:

"This agreement shall terminate absolutely and immediately whenever the Terminal ceases to operate the said facilities as a public wharfinger for the handling of freight, and in any event shall be terminable by either party on thirty days notice in writing."

A large amount of private commercial traffic continued over the released portions of the piers, and the railroads continued to absorb the cost of that wharfage and handling by paying Stevenson & Young $1.00 per ton of freight.

The result of the Army's insistence on operating its own pier facilities is that the Army pays the same export rates without receiving wharfage and handling services as commercial shippers do for whom the railroads provide those services at no additional charge. Because the Army provides these services itself, it claims a right to the $1.00 per ton payment paid by the railroads on behalf of the commercial shippers.

In terms of the Interstate Commerce Act, the Government bases its argument on two grounds:

"The railroads' refusal to absorb wharfage and handling charges on Army freight to the same extent that they absorb such charges on civilian freight moving over the same piers under identical rates is unjustly discriminatory in violation of Section 2 of the Interstate Commerce Act."

and

"The railroads' refusal to pay for wharfage and handling on Army freight was an unjust and unreasonable practice in violation of Section 1 (6) of the Act."

It should be noted that the United States is not attacking the form of the tariff, which provides for both line-haul service and the accessorial services in the single factor export rate.[8] Consequently, this case involves only charged discrimination and injustice. Cf. *United States* v. *Interstate Commerce Commission*, 337 U. S. 426, 437–438. In short, the United States seeks to be excepted from the tariff requirement that calls for the shipper to use a public wharfinger under contract to the railroads for performance of the wharfage and handling.[9]

---

[8] See *United States* v. *Aberdeen & Rockfish R. Co.*, 289 I. C. C., at 61. It seems clear that such an attack could be made if present conditions justified a re-examination. The War Department attacked the practice in 1921 but its objection was overruled by the I. C. C. in 1929 after a thorough investigation in a 6–5 vote. *Wharfage Charges at Atlantic and Gulf Ports*, 157 I. C. C. 663, 678–686. Separation was sought largely to force the railroads to increase terminal charges so that competitive municipal and other nonrailroad wharfingers might expand to develop better port facilities. The Commission reached the conclusion that such separation was inadvisable, as there was no evidence of injury from such practice.

"The carriers afford port facilities in competition with each other at the ports and a competitive condition exists which can not be eliminated by the mere segregation of uniform port charges. If the port charges were uniform at all ports the carriers still could meet competition by shrinking their line-haul rates. If the port charges were different at each port the carriers having the larger charge could shrink their line-haul rates sufficiently to offset the larger port charge, and the real substance of the present ship-side rates, where they exist, would be reestablished." *Id.*, at 684.

It was the sensitivity of the foreign importers and domestic ports to rates so stated that led to this conclusion. In the highly competitive railway network, export traffic is an important factor to the carriers and the ports. Costs of port handling vary widely, 157 I. C. C., at 673. Such variations are now absorbed in the practice of quoting shipside delivery in tariffs.

[9] Such an exception is beyond the requirements of § 6 (8) of the Act that provides for preference and precedence for United States shipments in emergencies.

This controversy is similar to one that arose out of the Army's cancellation of the Norfolk pier leases during World War II, *United States* v. *Aberdeen & Rockfish R. Co.*, 269 I. C. C. 141. Interpreting railroad practices much like those now before this Court, the I. C. C. determined that the Army was not being discriminated against. However, on review, the Court of Appeals for the District of Columbia remanded the case to the I. C. C. for further exposition and clarification. 91 U. S. App. D. C. 178, 198 F. 2d 958. On remand the I. C. C. reaffirmed its earlier determination and no appeal has been taken from that order. 294 I. C. C. 203. Because the question of whether the Army was discriminated against following the Government's World War II lease cancellation has never been finally passed upon, the District of Columbia ruling is not inconsistent with the Commission's conclusion in this litigation.

## II.

The Government asserts that it is charged more on its export shipments through the Norfolk Army Base than commercial shippers under substantially similar circumstances. Such an exaction would be, of course, an unjust and unreasonable practice of discrimination. But it seems apparent that the circumstances of Army shipments are markedly different from those of private shippers that receive wharfage and handling services. Moreover, it seems equally clear that the Army is treated identically with those shippers who for business reasons do not care to comply with the tariff requirements.

The Army routed its export shipments direct to itself at the Army base as consignee. As is shown by the contracts summarized above, the entire Army base property was under military control except for the commercial

operations of Stevenson & Young. The base included piers, bulkheads, railways and storage warehouses, and railroad switches, tracks and yards. The Commission found that the Army had determined "that ports of embarkation must be operated by personnel of the military service and civilian employees of the Government." 289 I. C. C., at 53.[10]

Although the Army hired the Stevenson company to operate the Army portion of the base, the Army's control was "absolute."

> "[An Army yardmaster] is on duty at all times to give instructions for disposition of cars of Army freight delivered at the base. When either the Belt Line or the Virginian has cars for delivery, the yard clerk at the base is notified by telephone. If placement at a pier or warehouse is ready for any of those cars, the carrier is told where to make delivery. These instructions are confirmed in writing and handed to the conductor when he arrives at the base. Cars for which placement orders are not ready are left in the pier No. 1 yard by the Belt Line and in the

---

[10] This conclusion was amply supported by testimony of a Government witness, the Commanding Officer, Hampton Roads, Port of Embarkation:

"Only such personnel has the requisite training in the intricate nomenclature pertaining to the items and to the documentation required in connection with the proper loading and dispatching of vessels.

"A vast amount of pre-stowage planning of vessels in a port of embarkation must precede the labor of actual loading. Precise knowledge of overseas requirements must be available. Therefore, controls required to be exercised of all shipments must be absolute. These. begin when freight is ordered shipped from points of origin and continue until the various commodities reach their final destination overseas."

uptown yard by the Virginian, in accordance with a general understanding as to the disposition of such cars." 289 I. C. C., at 54–55.

Such direction was necessary. As the Commanding Officer said, in regard to switching and placing by the carriers:

"The Witness: If you would let them switch themselves, they have to know what they are doing, we have to give them the switch list and know what to do with it.

. . . . .

"Q. Will you permit them to do it at their own convenience, in an orderly manner?

"A. I don't know how any business can be run, if you run it at the convenience of someone else. They couldn't possibly do it at their own convenience, unless their convenience coincided with our requirement.

. . . . .

"Q. And yet you couldn't permit the terminal operator to operate in a normal way.

"A. No, because that involves a management problem. You would have to have a management team in here to settle the accounts of the terminal operator. They don't work for nothing, as you quite well know. Somebody has to monitor all that, manage the whole thing, and direct the bringing in of the cargo. That is all in over-lay staff of ours, which is large enough."

This Army control over the movement of freight on those portions of the piers that were not leased to Stevenson & Young left the railroads serving the base without authority in those areas to direct the switching, spotting

and removal of the cars according to their own convenience. 289 I. C. C., at 64.

The fact that the Army controls its areas of the base, and the fact that the railroads handle their own wharfage and switching on their portions as they choose, are not mere formal differences. They are factors in traffic movement.

> "It is the right of every shipper including the Government as here concerned, to prohibit a carrier from performing switching upon private tracks, even though the carrier might be willing and able to perform the service. When so prohibited by the shipper, as was here done by the Army, the carrier's obligation to perform the service is discharged, and the payment of allowances to the shipper for its performance of the service, in whole or in part, would be unlawful, except as a voluntary concession of the carriers to the Government under section 22." 289 I. C. C., at 65.

The problems of the assumption by the carriers of the costs of wharfage and handling at ports have a long history. The Norfolk area has not been an exception, as has been heretofore indicated. See p. 168, *supra*. When the Government again in 1951 found it desirable to cancel the leases, it was familiar with the various facets of the controversy over wharfage and handling.[11]

---

[11] The Government's request for export rates on its war shipments was granted by the railroads so that commercial and government export freight had the same rates. Cf. *War Materials Reparation Cases*, 294 I. C. C. 5. This was a substantial concession by the railroads, contrary to their tariffs, and done only because of § 22 of the Interstate Commerce Act, 49 U. S. C., allowing concessions to the United States. 289 I. C. C., at 63. The railroads have also spotted cars for the Army after delivery in the storage yards without

## III.

It is obvious that the method of handling government freight does not comply with the tariff requirements. It does not move over wharf properties owned, leased and operated by the Stevenson company "as a public terminal facility of the rail carriers." Rule 47 (b), n. 7, *supra*.

"At all times during that period, military traffic was stored on and handled over wharf and other properties on the Army Base which were under the exclusive control of the Army." 289 I. C. C., at 60.

Any deviation from tariffs by carriers violates § 6 (7) of the Act, 49 U. S. C., unless they grant a concession under § 22.[12]

## IV.

The Government actually is being treated just as any shipper who decides not to take advantage of the services offered in the tariff. It seeks a preference over these other shippers who take deliveries of export rate traffic at piers under their own control, so-called private piers. The general practice at North Atlantic ports is to refuse to absorb handling charges at private piers, even though they are absorbed where the carriers have control of the facilities.

extra charge. Other shippers would be charged for such service. 289 I. C. C., at 55. See *United States* v. *American Tin Plate Co.*, 301 U. S. 402. Such relaxation of possible additional charges·by the railroads does not decide the Army's claim for allowances for handling. The Commission did take the concessions into consideration, however, as to the fairness of the refusal to grant the claimed allowances. 289 I. C. C., at 64.

[12] Although the Government seeks only an allowance of the published charge absorbed by the carriers of $1.00 per ton, the kind of service it requires in its area is illustrated by the fact that it pays $2.87 for handling. 289 I. C. C., at 61 *et seq.*

The record shows 84 private piers along the Atlantic Coast where the railroads make no allowance or compensation for handling or wharfage. It was testified:

> "One of the principal limitations on the port practices which I shall mention is the restriction of the loading practice to railroad or other public piers, as distinguished from private piers operated by shippers."

There was no evidence to the contrary and the Commission accepted that situation as a fact. 289 I. C. C., at 58, 61, 63. The difference between a public and a private pier under the tariffs is whether the railroads have control of the areas directly or through their agents, or whether the shipper or consignee has control.

There is no objection to such a practice generally, whether the line-haul rates and the handling rates are stated in a single factor rate or separately. To require the carriers to furnish such accessorial services at every private pier would disperse the traffic, cause the maintenance of more crews or watchmen, and thus add to the cost of transportation.

The Government contends that it is not in the same position as other shippers who control private piers, because it took control of the Norfolk piers to meet a national emergency. But we think that the emergency cannot convert the Government's operation of its private piers into a category different from that of private shippers.[13]

---

[13] The Army's reliance on *Atchison, T. & S. F. R. Co.* v. *United States,* 232 U. S. 199, is misplaced. There this Court sustained the Commission in granting a shipper of fruit the right to precool the car and contents, although the carriers were in a position to refrigerate, though not in the better way. As the carriers were not in a position to perform the service properly, they could not by a tariff deny the consignor such right.

And, the fact that the operations of the Government and the railroads are in the same pier area seems to us immaterial. If the railroads gave an allowance here, excepting one given under § 22 of the Act, they would have to give it at all private piers where the shipper wanted to handle wharfage at its own discretion. Cf. *Merchants Warehouse Co.* v. *United States,* 283 U. S. 501; *Weyerhaeuser Timber Co.* v. *Pennsylvania R. Co.,* 229 I. C. C. 463.

The Government has the right to have its shipments accorded the same privileges given others. Moreover, in emergencies its traffic may have "preference or priority in transportation," 49 U. S. C. § 1 (15) (d), and it may be granted and may accept preferences in rates.[14] But the Government cannot otherwise require extra services or allowances. In the situation here presented, it could have used the same facilities as commercial shippers and obtained the benefits of the tariff. The evidence to this effect is uncontradicted.[15] The Commission accepted it as a fact. 289 I. C. C., at 58, 60–61, 63.

---

[14] "Nothing in this chapter shall prevent the . . . handling of property free or at reduced rates for the United States . . . ." 49 U. S. C. § 22.

[15] "If it were not for the fact that the Government has reasons for handling its water-borne traffic differently from commercial shippers, there would be no reason why the Government should not use public piers like other shippers. There is no question but that a private shipper operating his own pier and handling his own traffic in a manner similar to the operation of the Norfolk Army Base today would not be entitled to the port rates."

289 I. C. C., at 63: "Evidence presented by the defendants supports their position that it is not unreasonable to refuse to extend wharfage and handling services to traffic handled over private piers when the shipper does not wish to use adequate facilities of the defendants. The defendants serving the Norfolk port area have had available port facilities more than ample to handle all the military traffic moving over the Army Base at Norfolk, at least on and since May 1, 1951."

## V.

The Commission drew from the above circumstances a conclusion that the tariffs and conduct of the railroads are not shown to have been unlawful.

The United States argues that carriers cannot perform accessorial services in such a way that "some shippers would pay an identical line-haul rate for less service than that required by other industrial plants." *United States* v. *United States Smelting Co.*, 339 U. S. 186, 197. To do so would indeed violate § 2 of the Interstate Commerce Act.[16] But the *Smelting* case is not apposite. We affirmed a Commission order enjoining intra-plant car switching and spotting services after termination of the line haul. It terminated at a "convenient point" on a siding at consignee's plant. Our decision there turned on and upheld the Commission's power to determine the end point of the line haul. Because the line-haul tariffs included only car movement to and from that convenient point, some shippers received more service than others for the line-haul rate. P. 197.[17] Thus our determination was based on the unlawful preference allowed some shippers by the tariffs since those discriminated against could not get the same service as other shippers.

Furthermore, whether the circumstances and conditions are sufficiently dissimilar to justify differences in rates

---

[16] 49 U. S. C. § 2, n. 2, *supra.*

[17] A typical tariff reads:

"Delivery of a line-haul carload shipment destined to smelter at Leadville, Colo., will include movement within smelter plant over track scales, to and from thaw-house, to and from a smelter sampler or to and from a combination sampler and concentrator to a designated unloading point indicated by the sampling company." 339 U. S., at 196. See also *United States Smelting & Refining Co.*, 266 I. C. C. 476, 478.

or charges is a question of fact for the Commission's determination.[18]

The District Court dismissed the complaint on the record before the Commission, and we affirm.

*Affirmed.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE concurs, dissenting.

From the very beginning the Interstate Commerce Act has made it unlawful for railroads to discriminate by charging some shippers more than others for carrying the same kind of freight the same distance. The provisions of the Act make it clear that the ban on such discrimination cannot be evaded by any contrivance or guise that

[18] *L. T. Barringer & Co.* v. *United States*, 319 U. S. 1, 6–7: "Whether those circumstances and conditions are sufficiently dissimilar to justify a difference in rates, or whether, on the other hand, the difference in rates constitutes an unjust discrimination because based primarily on considerations relating to the identity or competitive position of the particular shipper rather than to circumstances attending the transportation service, is a question of fact for the Commission's determination. Hence its conclusion that in view of all the relevant facts and circumstances a rate or practice either is or is not unjustly discriminatory within the meaning of § 2 of the Act will not be disturbed here unless we can say that its finding is unsupported by evidence or without rational basis, or rests on an erroneous construction of the statute."

For the same reasons, in *Baltimore & Ohio R. Co.* v. *United States,* 305 U. S. 507, 526, dealing with storage of goods in transit, and *United States* v. *American Tin Plate Co.*, 301 U. S. 402, 407–408, dealing with post-line-haul switching practices, this Court has upheld the Commission's determination of unfairness vis-à-vis other shippers and its prohibitory orders. See *Seaboard Air Line R. Co.* v. *United States,* 254 U. S. 57; *Merchants Warehouse Co.* v. *United States,* 283 U. S. 501; *United States* v. *Wabash R. Co.,* 321 U. S. 403, 410.

accomplishes the prohibited end.  In the present case the undisputed evidence, as well as the Interstate Commerce Commission's findings, convinces me beyond doubt that the railroads are subjecting the United States, as a shipper, to precisely the kind of discrimination which the Act prohibits.  When the mass of verbiage which has befogged this case is stripped away, the issues are not complex and no expert guidance is needed for their proper resolution.

The Government owns several piers at Norfolk, Virginia which are connected by tracks with the main lines of certain major railroads.  Storage space is provided on the piers for freight.  For many years the piers were leased to a private terminal operator.  This operator has a contract with the railroads hauling to the piers to perform handling and wharfage services with respect to their freight.  The railroads pay the operator $1 per ton for these services.  They do not charge shippers separately for this handling and wharfage but instead include the cost with the transportation charges in a single line-haul rate.

Shipments by the United States through the piers were handled exactly the same as any other shipment.  The operator, acting under contract with the railroads, performed the necessary unloading and storage; the railroads paid it $1 per ton for these services; and the Government paid the railroads the single rate covering both transportation and pier services.  The Government was not required to pay anything in addition to this single rate.

In 1951, however, with the outbreak of the Korean conflict, the Government found it necessary to operate directly certain portions of the piers in order to facilitate the shipment of military supplies.  The Government hired the same operator who was acting for the railroads to perform the same services in handling government shipments as he had before.  The sole difference was that the operator acted under contract with the Government and

was paid by it rather than by the railroads. The railroads continued to charge the same line-haul rate as before, however, on government shipments. The Government requested that the railroads continue to pay the $1 per ton for handling and wharfage of its shipments. The railroads refused. The net result is that the Government receives less services from the railroads than other shippers although it pays the same rate. Or stated in a more familiar manner it is compelled to pay more than other shippers for the same transportation even though they all ship the same kind of freight from the same points to the same pier.

Nothing in the record below or in the arguments presented to us justifies this plain discrimination. There is no finding, nor even any indication, that it costs the railroads one penny more to transport freight to the portions of the pier operated by the Government than to the immediately adjacent parts of the pier operated by their agent. And the mere fact that a discriminatory rate is embedded in a tariff does not make it legal.

It is claimed that the railroads can establish a general rule that they will not pay for wharfage and handling costs at private piers. This is undoubtedly true, but it does not follow that they can include within the line-haul rate charges for handling services at such piers that the railroads do not perform. Under any realistic appraisal, the railroads' costs for handling and wharfage services in the present situation are included as a part of their line-haul rate and are in no sense a "free service." The Government is compelled to pay this rate to get its goods transported. But, as the Interstate Commerce Commission expressly found, wartime conditions make it wholly impractical for the Government in shipping certain military goods to use the wharfage and handling services provided by the railroads under this rate. The Government is entitled to recover that portion of the "line-haul"

rate which it is charged for services that it cannot use. That is all it claims. There is no reason why the railroads should be allowed to operate in a manner that exacts a transportation charge from all shippers for benefits that some can enjoy and others, although in exactly the same situation, cannot. As this Court said in *Union Pacific R. Co.* v. *Updike Grain Co.*, 222 U. S. 215, 220, "A rule apparently fair on its face and reasonable in its terms may, in fact, be unfair and unreasonable if it operates so as to give one an advantage of which another similarly situated cannot avail himself."

I would reverse the judgment below.