**UNITED STATES of America,**
**Plaintiff,**

v.

**T. SMITH & SON, INC., and The Texas and Pacific Railway Company,**
**Defendants.**

**Civ. A. No. 11874.**

United States District Court
E. D. Louisiana,
New Orleans Division.

July 29, 1966.

Louis C. LaCour, U. S. Atty., Ernest N. Morial, Asst. U. S. Atty., Eastern Dist. of Louisiana, New Orleans, La., Katherine A. Markwell, Office of Gen. Counsel, U. S. Dept. of Agriculture, Washington, D. C., for plaintiff.

Lemle & Kelleher, Charles Kohlmeyer, Jr., H. Martin Hunley, Jr., New Orleans, La., for T. Smith & Son, Inc.

Phelps, Dunbar, Marks, Claverie & Sims, J. Barnwell Phelps, New Orleans, La., for Texas and Pacific Ry. Co.

AINSWORTH, District Judge:

Commodity Credit Corporation, an agency of the United States, purchased large quantities of raw sugar in the latter part of 1955 from Louisiana producers under the Government's Foreign Mutual Security Program for export to foreign countries (other than Canada). Under contracts with the sellers the sugar was shipped from various origin points in Louisiana to Westwego, Algiers and Gretna, subports of New Orleans, during the period April 2, 1956 to July 20, 1956. Some of the shipments moved over the defendant, Texas and Pacific Railway Company (T&P), and shippers were reimbursed by Commodity Credit Corporation for the amounts of freight charges paid by them. Commodity Credit believed that the transportation of the sugar from Louisiana origins to New Orleans subports was intrastate in character and that intrastate rates should be applied by the railroad.[1] If intrastate rates were in fact applicable to this movement, existing tariff provisions did not obligate the carrier to unload the

---

[1]. "Several times, beginning on April 11, 1956, the Cincinnati office contacted the carriers seeking application of the intrastate rates to the shipments, but each time its request was denied." 306 ICC 528. At no time, however, during the course of the shipments did the plaintiff make any demand that the T&P furnish shipside services and at no time was possession of such shipments tendered to the T&P after delivery to Smith. (See testimony of Witness Ogilvie.)

sugar or to perform any other services in connection with the shipments when they arrived at the New Orleans subports. The railroad disagreed with Commodity Credit's view and insisted that export rates be applied on these shipments.

On January 18, 1956, Commodity Credit entered into a written contract with defendant, T. Smith & Son, Inc., a stevedoring concern at New Orleans, for certain services in connection with the unloading of the shipments of raw sugar (both in bulk and in bags), to place it alongside vessels and to perform other operations in connection with this movement. Smith was to receive the bulk and bagged sugar as Commodity Credit's agent, unload and bag it and place the sugar free alongside ship (f. a. s.), in accordance with the customs and practices of the port, and pay wharfage charges. The sugar was to be graded and inspected and title would not pass to Commodity Credit until satisfactory evidence was presented by Smith that the sugar met with certain specified contractual standards of grading and polarization. Smith held the sugar until such time as Commodity Credit definitely determined its disposition. After taking delivery of the shipments Smith inspected the bagged sugar for damage, made necessary repairs and bagged the bulk sugar. It then marked or tagged the bags in accordance with instructions from Commodity Credit.[2] The bagged sugar was then ready for delivery f. a. s. vessel by the agent, remaining in its possession until final disposition by Commodity Credit. Complete control and possession of the shipments was always solely with Commodity Credit or its agent, Smith.

Believing that it was aggrieved by the carrier having assessed higher export rates and that the shipments should carry lower intrastate rates, Commodity Credit Corporation filed a complaint against T&P on February 27, 1958 with the Interstate Commerce Commission. On May 13, 1959, in a written opinion (306 ICC 525), the ICC held that the shipments were in continuous movement from Louisiana origin points and the holding by Smith at New Orleans was only a temporary detention in the movement of the sugar to the vessel side for loading and transportation to the ultimate foreign destination; therefore, that the shipments were export traffic moving in foreign commerce subject to the Interstate Commerce Act and export rates properly should be charged. However, the ICC found that the carrier had improperly assessed rates in excess of those applicable for export traffic and ordered reparation in the sum of $11,638.85.

Smith unloaded 77,697 bags at the Westwego Wharf and 36,591 bags at Gretna or Algiers. For the services which Smith rendered in connection with unloading of the bagged sugar and placing it shipside, in connection with the movement, as well as other services, Smith was paid by Commodity Credit at the rate of 22.5 cents per bag.

The Government contends that under rail tariffs applicable to foreign shipments, it was entitled to have the shipments of bagged sugar unloaded and placed f. a. s. vessel at the New Orleans subports at the cost of the carrier and without further obligation, this service being included in the line haul rate. It has sued Smith, which it paid for unloading and placing f. a. s. vessel (as well as other services), and the railroad on the theory that the railroad owed it this additional accessorial service which it did not render and, therefore, has a "moral obligation" (Gov. brief, p. 13) to reimburse Commodity Credit for the cost of these services in the identical sum paid to Smith to prevent inequity and injustice.

It is not clear to us on what legal theory Smith is sued in this case. Smith

2. The Government contends that marking or tagging of bags by Smith applied only to shipments of bulk sugar and not to bagged sugar. But the ICC report in the reparation case, filed after a trial on the merits, indicates that these services applied to "bags" generally without such distinction. (See 306 ICC 528.)

had no arrangement or agreement with the rail carrier to perform these services, its only agreement pertaining to these shipments being the one in writing with Commodity Credit dated January 18, 1956. No one disputes that Smith satisfactorily performed the services under that contract which it agreed to perform and that it was paid no more or no less than it was entitled to receive. But the Government wants Smith to obtain reimbursement from the railroad which the Government contends should have paid the cost and refund this amount to Commodity Credit. No basis has been shown us nor authority cited why Smith should have to pay back to Commodity Credit the amounts it received for services contracted for and rendered pursuant to the written agreement. We hold, therefore, that the suit as to Smith was improvidently brought and should be dismissed.

■ We find that the tariffs applicable to foreign traffic for bagged sugar provided for handling and terminal charges necessary to effect delivery to shipside at the New Orleans subports. However, Commodity Credit did not avail itself of the services which the tariff provided for and arranged for similar services with Smith. The evidence indicates that Commodity Credit also had Smith perform additional services, such as acting as agent for Commodity Credit, marking and tagging bags, inspecting bagged sugar for damage, making necessary repairs, arranging for storage and maintaining possession of the commodity until final disposition was ordered by Commodity Credit, supervising and scheduling all movements. These are obviously not the same accessorial services which the railroad would have been obligated to perform under applicable export traffic tariffs. In order to handle these shipments it was also necessary that Smith lease a portion of the Westwego Wharf facilities and advance arrangements were made by Smith prior to the time of the arrival of shipments at New Orleans.

■ The Government contends that the payments made by Commodity Credit for Smith's services were made under mistake and that it should have judgment jointly against both Smith and T&P [3] because T&P was obligated to unload the bags of sugar at New Orleans and place them f. a. s. vessel but failed to do so; [4] that in permitting Smith to perform the services, T&P accepted the benefit thereof and is obligated now to reimburse Commodity Credit for what was paid to Smith.[5]

■ T&P customarily performed unloading services at New Orleans on export shipments with its own crew and had no contract or arrangement with Smith during the involved period. Commodity Credit never requested or demanded that the railroad perform the services authorized by the tariff for unloading and placing the shipment f. a. s. vessel at New Orleans. The obvious reason is found in Commodity Credit's persistent contention that the shipments moved under intrastate tariffs rather than export tariffs. If they moved under intrastate tariffs, no unloading services by the carrier were authorized by the tariff. Commodity Credit, though informed by the carrier that its position was that intrastate rates were not applicable, moved ahead in its belief that they

3. There is also an additional claim against Smith only of $4,814.32 in connection with bagged sugar placed shipside at Algiers or Gretna, being the difference between the $8,232.97 collected by Smith from Commodity Credit on which Texas and New Orleans Railroad Company was the delivering carrier, and the sum of $3,418.65 Smith forwarded to Commodity Credit which it collected from Neeb Kearney Company (T&NO Railroad Company's stevedore by written contract).

The reasons we have given for dismissal of the suit as to Smith are equally applicable to this separate demand.

4. The services of Smith were contracted for by Commodity Credit on January 18, 1956, approximately three months before the *first* shipment moved.

5. There is no evidence in the record whatsoever as to the actual value of the services the Government contends should have been rendered by the railroad.

were intrastate and hired the services of a private stevedore, Smith, to perform the unloading and placing f. a. s. vessel at New Orleans, as well as for numerous other services in connection with the movement. The T&P's unloading facilities were available to handle these shipments but Commodity Credit did not use them, choosing to hire the services of Smith instead. By electing to hire Smith rather than use the services of the rail carrier to perform unloading and placing f. a. s. vessel, Commodity Credit waived the benefit of the tariff provisions providing for certain accessorial services and cannot now properly claim that it acted under a mistake of fact or law. The evidence indicates that it is not unusual for the Government to waive the benefit of unloading shipments and placing them f. a. s. vessel at New Orleans. At the New Orleans Port of Embarkation, a United States Army facility, it is the usual practice and the Government's own crew performs all of the services of unloading, placing in the warehouse and eventually loading on vessels for foreign shipment. No claim is made for reimbursement from the carrier for the failure of the Army to exercise its right to require the carrier to unload and place f. a. s. vessel at New Orleans. This is simply a matter of choice or convenience of the Government.

The case of United States v. Interstate Commerce Commission, 352 U.S. 158, 77 S.Ct. 241, 1 L.Ed.2d 211 (1956), cited by T&P, is in point. At the Norfolk Army Base, the Government decided not to take advantage of the services offered in the tariff for unloading and placing shipments f. a. s. vessel at the carrier's expense. The Government then sought an allowance for its own performance of these wharfage and handling services on its own export freight. The Supreme Court held that the Government was not entitled to an allowance, that it was being treated equally with other shippers who for business reasons did not care to comply with the tariff requirements. The situation is identical here. Commodity Credit elected not to use unloading serv-ices available to it at New Orleans by the rail carrier and provided for in the export tariffs without additional cost. It cannot now seek an allowance under the contention that it paid for the same services to a private stevedore, Smith. This is particularly true under the facts here because the evidence shows that Smith's services were not the identical services called for by the export tariffs; in fact, that Smith performed many additional services not contemplated by the tariff provisions.

The Government has failed to prove its case and its suit must, therefore, be dismissed as to both defendants.