converted by the appraiser at a rate of 15.3 pesos per dollar; and there is no evidence of record as to what the actual buying rate was with respect to these charges, costs, and expenses which, as so converted by the appraiser, aggregate the sum of $0.3166 per appraised unit of this merchandise.

10. That allowances for ocean freight, insurance, general expense, and profit, aggregate $0.9617 per appraised unit of this merchandise, which the appraiser allowed.

I conclude as a matter of law:

1. That at the time of exportation there was no foreign value or export value for the canned corned beef, subject of this appeal, as such values are defined in section 402 of the Tariff Act of 1930, as amended.

2. That United States value, as defined in section 402(e) of the Tariff Act of 1930, as amended, is the basis of value for appraisement of such merchandise.

3. That the invoice item "Exchange Retention, 15%" is a necessary expense from place of shipment to place of delivery, and, as such, is allowable as a deduction from United States selling price in order to compute United States value of the merchandise.

4. That the value of this retention deduction is convertible from Argentine currency into United States currency at the official rate of 18 pesos per dollar, which is actual buying rate.

5. That the deductions allowable in appraisement for loading permit, stamp on bill of lading, Argentine statistical charges, exchange stamp tax, export sales tax, lucrative activities tax, lighterage charge, and placing on board charge are convertible from Argentine currency into United States currency at the rate of 15.3 pesos per dollar used by the appraiser; there being no evidence as to actual buying rate and, therefore, the presumption of correctness of the appraiser's action with respect to these transactions has not been overcome.

6. That the United States value of the entry canned corned beef is $2.69475 per dozen tins, 12 ounces, net packed.

7. That the value of entry merchandise other than canned corned beef is the appraised value.

Judgment will be entered accordingly.

**BENTON RAPID EXPRESS, INCORPORATED**

v.

**UNITED STATES.**

No. 217–54.

United States Court of Claims. April 8, 1959.

Julian C. Sipple, Savannah, Ga., for plaintiff. Lawton, O'Donnell, Sipple & Findley, Savannah, Ga., were on the brief.

Curtis L. Wagner, Jr., Knoxville, Tenn., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

JONES, Chief Judge.

This is a suit for additional charges for the transportation by motor truck of a number of shipments of internal combustion engines between Air Force bases in Georgia. The shipments were between the Robins Air Force Base at Warner Robins, Georgia, and the Chatham and Hunter Field Air Force bases, both of the latter being located at Savannah, Georgia.

Each bill of lading contained the following notation:

"Released at full valuation. Lowest rating per Item 61244, National Motor Freight Classification No. 10 applicable."

The reverse side of each bill of lading contained the following condition under the caption "General Conditions and Instructions:"

"It is mutually agreed and understood between the United States and carriers who are parties to this bill of lading that

\* \* \* \* \* \*

"5. This shipment is made at the restricted or limited valuation specified in the tariff or classification at or under which the lowest rate is available, unless otherwise indicated on the face hereof."

Findings 5 and 6 set out the provisions of National Motor Freight Classification No. 10 which were in effect on motor shipments in Georgia during the period of these shipments. The rules issued by the Georgia Public Service Commission in respect to motor freight rates were in effect during that period. Pertinent parts of these rules are set out in finding 12.

It is plaintiff's contention that it is entitled to the rate prescribed by the Georgia Public Service Commission; that that valuation governed the rate and that since the articles were released at full valuation it is entitled to the rate thus prescribed unless there was a definite agreement for a lower rate, which it denies.

The defendant takes the position (1) that the second sentence quoted above indicated a lower item rate[1] than would have been applicable otherwise, and (2) that the railway rates were less than motor rates at that time and that pursuant to an order by the Chief of Transportation there was a definite understanding between the parties that the lower rates would apply; that otherwise the shipments would have gone by rail.

Thus there are two issues, first, the interpretation of the language on the bills of lading and, second, the factual issue as to whether there was an understanding or agreement for the lower rate to conform to the rail competition. The two issues are interwoven.

The notation found on the face of each bill of lading was placed there pursuant

[1]. Under the Interstate Commerce Act, 49 U.S.C. § 22.

to an order dated March 4, 1949, issued by the Chief of the Transportation Division, Office of the Deputy Chief of Staff and sent to all the major Air Commands in the Zone of Interior. The order reads as follows:

"Reference shipments of airplane engines via commercial motor freight. Released valuation items not suspended by Interstate Commerce Commission. Motor freight transportation of internal combustion engines now considered premium transportation and will not originally be used unless carrier agrees to and transportation officers insert following notation on bills of lading: 'Released at full valuation. Lowest rating per Item 61244, Supplement 21, National Motor Freight Classification No. 9, applicable.' When internal combustion engines must move by motor freight and carrier will not agree to above notation, the following notation will be placed on bills of lading: 'Lowest rate to apply per condition No. 5 this bill of lading.'"

The above order was issued as a result of conferences with many of the motor carriers. These carriers desired to regain the business of transporting the airplane engines which had been diverted to the railroads as a result of the amendment to the National Motor Freight Classification which set up the charges on the basis of the released valuation. The rail tariffs were not based on released valuation.

All the shipping points involved in this case were served by railroads. The railroad rate for transportation was less than the amendment provided in the Motor Freight Classification.

In their effort to get the business of transporting the engines, many of the motor carriers had given the Government specific section 22-type quotations, or had reduced rate tenders covering the transportation of these engines. The wording to be placed on the bills of lading was devised in a conference with many of the motor carriers to cover those carriers who had not given specific quotations on the engines. There was no evidence as to whether plaintiff was present at any of these conferences.

There is not the slightest doubt that if these shipments had been made with the simple notation on the bills of lading "released at full valuation" and there had been no qualification of this statement on the bills of lading and no agreement orally or in writing that a lower rate should apply, the plaintiff would be entitled to recover the sum for which it sues. On the other hand, if the notation on the bills of lading is construed as a limitation on the rates to be charged or if an agreement by the representatives of the respective litigants that a lower rate should apply is found to have been made, then the position taken by the defendant should be sustained.

To reach a proper conclusion we must interpret the meaning of the notation on the bills of lading and if the meaning of the notation is not clear we must determine whether or not there was an agreement between the respective litigants to have the lower rates made applicable to the shipments in question. If the notation on the bills of lading made the application of the lower rate perfectly clear it would not be necessary to go into the question of whether an oral or written agreement for a lower rate was made. However, there has been an extended dispute between the parties as to the exact meaning of the notation on the bills of lading. True, it could have been stated with greater clarity. But if it had been made crystal clear there would have been no lawsuit. As a consequence we have gone into the entire record to determine whether the notation taken in connection with the evidence as to an agreement served to clarify the entire situation.

At the threshold we are met with the undisputed fact that the railroad rates were less than motor rates if those motor rates were based on full valuation. It would seem strange that the defendant,

in spite of the order that had been issued and in spite of the agreements by other motor carriers to apply lower rates to other shipments, would nevertheless agree to pay plaintiff a higher rate for the transportation between the points involved when substantially lower rates were available through the railroads which served the same points.

In looking at the notations on the bills of lading it will be observed that immediately following the statement of release at full valuation is a sentence to the effect that the lowest rating per item in Motor Freight Classification No. 10 is applicable. Then in section 5 of the notation on the reverse side of the bills of lading is found the statement to the effect that the shipment was made at or under a classification which made the lowest rate available unless otherwise indicated on the face of the bills of lading. We are inclined to construe the bills of lading themselves as thus indicating that the lowest rate should be applicable, otherwise the second sentence would be without meaning and the provisions of section 5 would be largely without meaning.

On the question of whether there was an agreement, defendant's witness, Lt. Col. Douglass Symington, the Chief of Transportation of the Air Force at Savannah, Georgia, testified that prior to the shipments involved in this case he was interviewed by E. J. Benton, Sr., president of the plaintiff company, at which time he advised Mr. Benton, Sr., of defendant's requirement that the legend set out in finding 3 should appear on the bills of lading to provide for transportation at the minimum rate. It is conceded by the plaintiff that its president, Mr. Benton, was clothed with the authority to make section 22 quotations binding on the company. At the time of the trial of this case and the taking of the testimony Mr. Benton, Sr., was too ill to travel to Washington to give his testimony, and unfortunately he died before the time set for the taking of his testimony in Savannah, Georgia.

A section 22-type quotation of reduced rate tender need not be in any particular form but can be on the bills of lading, slips of paper, verbally or in any other form so long as it is understood between the parties that the rates to be charged are less than those applicable under tariff arrangements.

An effort was made on the part of the plaintiff to establish the fact that no agreement for the lower rates provided under section 22 had been made. Mr. Benton, Jr., testified that if there had been any such agreement he would have known it. However, apparently he did not know positively whether such an agreement had been made by his father. The best he could testify was that if there had been such an agreement he would have known it.

On the other hand, Col. Symington testified positively that he told Mr. Benton, Sr., it would be necessary in order for him to get the business that he agree to the placing of the notation "Released at full valuation. Lowest rate to apply", and that if he would not accept this Air Force requirement the business could not be given to the plaintiff. It would have been necessary to ship the articles by rail or other means. When we consider the notations on the bills of lading and place alongside them the testimony, positive in character, that there was an agreement between the parties that the lower rates should apply; when we consider the further fact that the lower rates by rail were available between the same shipping points, and that the authorities under the Chief of Staff had issued an order that as a condition to shipment by motor carrier the lower rates must apply, otherwise the articles would go by rail; and when we further consider the fact that if Col. Symington had not insisted on such an agreement he would have been violating the orders issued by the chief transportation officer, we are unable to reach any other reasonable conclusion than that there was such an agreement that the lower rates as provided by section 22 should be ap-

plicable. When the entire record is considered, any doubt that the notations on the bills of lading themselves were meant to make the lower rates applicable disappears.

■ There is no doubt that plaintiff's president had authority to agree to give the United States the lower section 22-type quotation on Georgia intrastate traffic during the period these shipments moved, and that this could be done at that time without prior approval of the Georgia Public Service Commission. In other words, a lower than the regular rate could be made applicable by agreement. This issue was settled in the case of Public Utilities Commission of California v. United States, 355 U.S. 534.

In the light of the entire record the position of the defendant is sustained. It is conceded that plaintiff is entitled to recover the sum of $68.77, and judgment will be rendered in favor of plaintiff for that amount.

It is so ordered.

MARIS, Circuit Judge (Retired), sitting by designation, and LARAMORE, MADDEN and WHITAKER, Judges, concur.