**UNITED STATES of America,**
**Plaintiff,**

v.

**GEORGIA PUBLIC SERVICE COMMIS-**
**SION, Defendant.**

**Civ. A. No. 7528.**

United States District Court
N. D. Georgia,
Atlanta Division.

Oct. 2, 1961.

Charles L. Goodson, U. S. Atty., Atlanta, Ga., W. Wallace Kirkpatrick, Acting Asst. Atty. Gen., Baddia J. Rashid, E. Riggs McConnell, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Eugene Cook, Atty. Gen., of Georgia, Ariel V. Conlin, Asst. Atty. Gen., for defendant.

Before TUTTLE, Circuit Judge, HOOPER, Chief Judge, and SLOAN, District Judge.

PER CURIAM.

The United States sues to prevent the Georgia Public Service Commission from regulating tariffs charged by carriers within the state of Georgia for the intrastate shipment of household goods of government employees under contracts made with the carriers by government agencies.

The state Commission is under the duty to prevent discriminatory rates for

intrastate shipments.[1] It conceives it to be its duty to prevent carriers from contracting with military or other federal government agencies to carry household goods of individual employees of the United States, when such shipments are wholly within the state of Georgia, at less than the published tariffs.

No issue is presented touching on the right of the Commission to regulate the rates charged by Georgia carriers for the carriage of strictly governmental property. The Commission concedes that this issue has been foreclosed in favor of the United States by Public Utilities Commission of California v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470.

The United States contends that since the carriage of the household goods of its employees, where authorized by law at government expense, is a proper exercise of the constitutional power of the government to engage in the enterprise, it makes no difference whether the carriage is of government property or is of personal property for the moving of which the government is liable. The policy of the federal government to arrange for carriage services, whether by bid or negotiation, at the cheapest responsible price, the government says, is the same in either case.

The Georgia Commission seeks to distinguish the facts here from those which resulted in the Supreme Court's adverse decision in the California case, saying that the Court is here dealing with a fact situation that calls for application of the principles laid down by the Supreme Court in the case of Penn Dairies, Inc. et al. v. Milk Control Commission of Pennsylvania, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748.

The case is not a simple one to resolve. All parties agree that under the supremacy clause of the Federal Constitution the federal government has the power, if it elects to exercise it, to prevent any interference by way of state regulatory schemes upon the proper exercise of activities constitutionally engaged in by the federal government.

"It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from its own influence." M'Culloch v. State of Maryland, 4 Wheat. 316, 427, 4 L.Ed. 579.

■ It is also clear that short of state taxation of the national government or state regulation of the performance of federal officials and agencies of governmental functions, State of Ohio v. Thomas, 173 U.S. 276, 19 S.Ct. 453, 43 L.Ed. 699; Johnson v. State of Maryland, 254 U.S. 51, 41 S.Ct. 16, 65 L.Ed. 126; Hunt v. United States, 278 U.S. 96, 49 S.Ct. 38, 73 L.Ed. 200; State of Arizona v. State of California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154, the states may, in the absence of congressional enactment, adopt non-discriminatory taxing statutes, and non-discriminatory regulations under the state's police power that may to some degree affect either the cost of the government's operation within the state or increase difficulties touching on such operation, State of Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3; United States v. Baltimore & Annapolis R. R. Co., 308 U.S. 525, 60 S.Ct. 297, 84 L.Ed. 444; Penn Dairies, Inc. et al. v. Milk Control Commission, supra.

■ The question we have here to decide, therefore, is whether the Georgia laws place a direct prohibition on the agencies of the federal government, or, if not, whether the federal laws authorizing the transportation in question impliedly prohibit inconsistent regulations.

The state's main reliance is on the Penn Dairies case, supra. There, notwithstanding an existing federal statute authorizing the military services to purchase by bid or negotiated contract the

---

1. See Georgia Code Ann. §§ 93–309, 93–310 and 93–407, as to railroad transportation. See Georgia Code Ann. §§ 68–613, 68– 614 and 68–9909, as to motor carrier transportation.

articles of food and other supplies needed for the armed services, the Supreme Court held that a contract made by a Pennsylvania dairyman for supplying the military forces in Pennsylvania at prices less than the established price of the Pennsylvania Milk Control Commission, could validly be treated by the Pennsylvania Commission as a basis for revoking the license of the dairy. The Court dealt with the matter in terms of the legality of the regulatory scheme of the Milk Control Commission when in conflict with the federal scheme of authorizing purchases at the lowest available price. The Court said [318 U.S. 261, 63 S.Ct. 620]:

> "The dairy's answer to the citation challenged the constitutional authority of the State to regulate prices charged to the United States."

The Court answered this question by saying:

> "Here the state regulation imposes no prohibition on the national government or its officers. They may purchase milk from whom and at what price they will, without incurring any penalty. See the opinion below [Penn Dairies, Inc. v. Milk Control Commission], 148 Pa. Super. 270–271 [24 A.2d 717]. As in the case of state taxation of the seller, the government is affected only as the state's regulation may increase the price which the government must pay for milk. By the exercise of control over the seller, the regulation imposes or may impose an increased economic burden on the government, for it may be assumed that the regulation if enforcible and enforced will increase the price of the milk purchased for consumption in Pennsylvania, unless the government is able to procure a supply from without the state, see Baldwin v. [G. A. F.] Seelig, 294 U.S. 511 [55 S.Ct. 497, 79 L.Ed. 1032]. But in this burden, if Congress has not acted to forbid it, we can find no different or greater impairment of federal authority than

in the tax on sales to a government contractor sustained in [State of] Alabama v. King & Boozer, supra; or the state regulation of the operations of a trucking company in performing its contract with the government to transport workers employed on a Public Works Administration project, upheld in Baltimore & Annapolis R. Co. v. Lichtenberg, supra [176 Md. 383, 4 A.2d 734]; or the local building regulations applied to a contractor engaged in constructing a postoffice building for the government, sustained in [James] Stewart & Co. v. Sadrakula, 309 U.S. 94 [60 S.Ct. 431, 84 L.Ed. 596]." 318 U.S. 261, 270, 63 S.Ct. 617, 621, 87 L.Ed. 748.

The record discloses that many state Public Service Commissions assumed from the language and decision of the Penn Dairies case that they were thus free to regulate the rates to be charged the government uniformly with those to be charged with other shippers for intrastate shipments of government property. This attitude on the part of the California Public Service Commission produced Public Utilities Commission of State of California v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470. The California statute, in effect, provided that its Commission should make uniform rates and see to their application without discrimination. It had a special provision, however, favorable to the United States. It provided that upon application by the United States the Commission had the power to authorize variations from the approved tariffs. Objecting to the necessity of applying in each case for the privilege of negotiating a freight rate for the carriage of the many military shipments within the state, the United States brought a suit before a statutory three-judge court in California to enjoin the interference by the Commission with the government's negotiation of rates with carriers as might be agreed upon. All of the evidence dealt with in that case touched upon the transportation of government

property. Much of the evidence demonstrated the need for unfettered handling of many of the important and some secret cargoes needed by the military forces.

The federal statutes which established the policy of the United States (10 U.S.C.A. §§ 2301–2314) as implemented by regulations were stated by the Supreme Court to "sanction the policy of negotiating rates for shipment of federal property and entrust the procurement officers with the discretion to determine when existing rates will be accepted and when negotiation for lower rates will be undertaken." 355 U.S. 534, 543, 78 S.Ct. 446, 452. The Court then said:

"It also seems clear that under Section 530 of the California Public Utilities Code this discretion of the federal officers may be exercised and reduced rates used only if the Commission approves. The question is whether California may impose this restraint or control on federal transportation procurement."

The Court answered this question in the negative, and distinguished Penn Dairies on the ground that:

"There the question, much mooted, was whether the federal policy conflicted with the state policy fixing the price of milk which the United States purchased. The Court concluded that the state regulation 'imposes no prohibition on the national government or its officers.' Id. [318 U.S.] at [page] 270 [63 S.Ct. at page 621]. Here, however, the State places a prohibition on the Federal government. Here the conflict between the federal policy of negotiated rates and the state policy of regulation of negotiated rates seems to us to be clear."

Our task then is twofold. First, we must determine the factual basis for the distinction drawn in the California case between that case and Penn Dairies. Second, we must decide which of these two cases more closely parallels the one before us for decision.

The state of Georgia argues that the procedural plan of the California law

which put the burden on the United States to apply for special treatment was a distinguishing feature, since it is apparent that under the Pennsylvania law there was an absolute prohibition against the sale of milk at less than the established price and the United States was not named or in any way singled out. The state contends that when the Supreme Court, in the California case, called attention to the fact that the Pennsylvania regulation "imposes no prohibition on the national government or its officers" it sought to point up this procedural matter, since the California law did impose on the national government the need to apply for an exemption if it wanted one. This, it seems to us, is clearly untenable. Certainly there is less of a prohibition on the national government where a state says it may negotiate contracts if it requests and obtains permission to do so, than where a state, like Pennsylvania and like Georgia, flatly says it may not negotiate at all.

In the California case, the Court noted that:

"* * * the Public Utilities Code provides penalties for violations of its provisions and orders issued thereunder. §§ 2107, 2112. These penalties are applicable not only to the carrier but to shippers as well. California Public Utilities Code, § 2112. As stated by the District Court, 'If a United States officer were to negotiate with a carrier for "reduced rates" without permitting the defendant to determine whether it "considered" the conditions of the contract "just and reasonable", he could be thrown into the county jail.' 141 F.Supp. [168], at [page] 186."

In Penn Dairies, on the other hand, the Court expressly stated that, "Here the state regulation imposes no prohibition on the national government or its officers. They may purchase milk from whom and at what price they will, without incurring any penalty." 318 U.S. at page 270, 63 S.Ct. at page 621. The basis for this statement completely escapes us. An ex-

amination of the Pennsylvania Milk Control Act reveals that penalties can be imposed on "any person" who "buys or receives" or "offers to buy or receive" milk at other than the approved prices. (31 Pa.Stat. § 700j–807).

In view of the fact that both the California law and the Pennsylvania law expressly provided sanctions against shippers who negotiated contracts other than as provided for by the regulatory agency, we are just not able to conclude that the Supreme Court, in the California case, found any distinguishing characteristic here. Moreover, the Courts which have followed the California case in striking down state regulatory legislation in the field of transportation have not even mentioned the penalty issue in reaching their decisions. See Hughes Transportation, Inc. v. United States, Ct.Cl.1958, 168 F. Supp. 219, certiorari denied 1959, 359 U.S. 968, 79 S.Ct. 879, 3 L.Ed.2d 835 [Kentucky Statute]; Union Transfer Co. v. United States, Ct.Cl.1958, 168 F.Supp. 217, certiorari denied 1959, 359 U.S. 968, 79 S.Ct. 878, 3 L.Ed.2d 835 [Nebraska Statute]; United States v. Pennsylvania Public Utility Commission, 1958, 393 Pa. 537, 143 A.2d 341, certiorari denied 1958, 358 U.S. 884, 79 S.Ct. 126, 3 L.Ed.2d 112 [Pennsylvania Statute]; Railroad Commission of Texas v. United States, 1958, 159 Tex. 197, 317 S.W.2d 927, [Texas Statute]; United States v. Pentecost, Chairman Tennessee Public Service Commission, rule 7844 Chancery part 2, Nashville, Tennessee [Tennessee Statute]. See also Benton Rapid Express, Inc. v. United States, Ct.Cl.1959, 171 F.Supp. 868, 872 [Georgia Statute]; Alabama Highway Express, Inc. v. United States, Ct.Cl.1959, 175 F.Supp. 143, 146 [Alabama Statute]; United States of America v. Carter et al., Fla., 121 So. 2d 433, 437.

In light of the foregoing analysis, we cannot say that the provisions for penalties in the Georgia statutes (Ga.Code Ann. § 68–9909) compels us to follow the California case here.

Finally, the state comments on the distinction between the need for the right to negotiate for the shipment of strictly military goods (the issue in the California case) and the need for the right to negotiate for the purchase of milk (the issue in Penn Dairies) or the shipment of household goods (the issue in the instant case). Since there are no other significant factual distinctions between California and Penn Dairies, we can only conclude that the difference in the character of the commodities dealt with was the element which the Supreme Court though justified its departure in the California case from the rule previously followed in Penn Dairies. The following language from the opinion in the California case is revealing [355 U.S. 534, 78 S.Ct. 453]:

"The seriousness of the impact of California's regulation on the action of federal procurement officials is dramatically shown by this record.

"It is the practice of the Government not only to negotiate separate rates which vary from the class or 'paper rate' but also to negotiate a 'freight all kinds' rate which will cover hundreds of diverse items for the supply of a division of the Army or for a vessel that are needed at one place at one particular time. There is no provision in the California Code or the regulations for the making of such shipments. The findings are that if the Code is applied here, this type of arrangement would be abolished:

" 'This would make it necessary for the shipping officers to classify the hundreds and thousands of different items used in military operations, to segregate such items in accordance with published tariffs and classifications, to rearrange the boxing and crating of such items in order to meet the classifications and requirements of commercial traffic and fill out voluminous documents. This additional process could cause delays as high as thirteen hours in the shipment of one truckload or carload. In many situations a delay of this sort would seriously hamper or

disrupt the military mission for which the shipment was made.'

"Moreover, no rates exist for much of the military traffic, which means that, unless the United States can negotiate rates for each shipment, the shipments will be delayed for Commission action unless shipped under the established rates which are higher than negotiated rates.

"General Edmond C. R. Lasher of the United States Army, who was Assistant Chief of Transportation, testified at the trial:

"'for us to make these arrangements at the Washington level with the various states, let us say 48 states, with 48 varieties of methods to follow, we would find ourselves in an administrative morass out of which we would never fight our way, we would never win the war.'" 355 U.S. 534, 545, 546, 78 S.Ct. 446, 2 L.Ed.2d 470.

See also the discussion as to the significance of the military character of the carriage in the dissenting opinion, 355 U.S. at pages 550 and 551, 78 S.Ct. at page 456.

Since the shipment of household goods by the United States does not present the unique and difficult problems encountered when military supplies are involved, it appears that the case before us has more in common with Penn Dairies than with California Commission v. United States. This being so, we must conclude that Penn Dairies controls our determination of the issue here.

We do not overlook the fact that our conclusion is at odds with that taken by the Supreme Court of Florida in United States v. Carter et al., supra, the only litigated case actually deciding the precise issue involved here, and with the practice followed by a number of state regulatory commissions which have interpreted the California decision as barring state interference with the negotiation of rates for the shipment of household goods by the United States.

Since, however, the Supreme Court, in the California case, did not overrule Penn Dairies but was at pains to distinguish it, there remains the necessity for us to determine which of these cases governs the issue here presented. We have, therefore, examined the cases carefully, and have decided that Georgia's attempt to regulate the rates at which the United States may ship household goods of its military and civilian personnel presents the same issue as was presented by Pennsylvania's attempt to set the price at which the United States could purchase milk for its military personnel. Assuming that the Penn Dairies case still stands as a precedent, as we must, we are compelled to conclude that the Georgia Public Service Commission can legally do what the Georgia statute says it can do. If our assumption of the continuing vitality of Penn Dairies is incorrect it must remain for the Supreme Court to say so.

It follows that judgment is entered for the defendants on their motion for summary judgment.