# UNITED STATES *v.* GEORGIA PUBLIC SERVICE COMMISSION.

No. 81.  Argued October 18, 1962.—Decided January 14, 1963.

*Solicitor General Cox* argued the cause for the United States.  With him on the brief were *Assistant Attorney General Loevinger* and *Lionel Kestenbaum.*

*Paul Rodgers,* Assistant Attorney General of Georgia, argued the cause for appellee.  With him on the brief was *Eugene Cook,* Attorney General.

*Austin L. Roberts, Jr.* filed a brief for the National Association of Railroad & Utilities Commissioners, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Civilian employees of the Federal Government were reassigned from Savannah to Atlanta, Georgia, and the General Services Administration sought to arrange by competitive bidding for the intrastate mass shipment of their household goods between those cities. Georgia law, however, does not permit a rate for transporting household goods of more than one family; it requires carriers to quote schedules of approved rates, the total charge to be the sum of the charges figured for individual families.[1] Five carriers submitted bids quoting rates lower than those allowed by the Georgia tariff. After the competitive bidding was over and the contract awarded to the lowest responsible bidder, the Georgia Public Service Commission threatened these five carriers with revocation of their intrastate operating certificates should they perform at the rates quoted GSA. The successful bidder thereupon notified GSA that it was unable to perform the contract. Appellee instituted proceedings against the carrier, looking toward the revocation of its certificate. The United States sought to intervene in that proceeding but it was not allowed to do so. Appellee also refused to allow a GSA official to testify as to the circumstances of the shipping contract that the Commission claimed conflicted with Georgia law.

Thereupon the United States filed suit in the District Court and requested the convocation of a three-judge court. The complaint alleged, *inter alia,* that Georgia law burdened federal officers in carrying out their federal functions and conflicted with federal procurement

---

[1] See Ga. Household Goods Tariff No. 1–B, GPSC–MF No. 3, Rules 8 and 15. The latter provides in part that "Property of two or more families or establishments will not be accepted for transportation as a single shipment."

policy. The issue as finally joined raises squarely those questions. The District Court held that there was no conflict between Georgia's regulatory scheme and the federal one, concluding that the case is governed by *Penn Dairies, Inc.,* v. *Milk Control Comm'n,* 318 U. S. 261. See 197 F. Supp. 793. The case is here on direct appeal (28 U. S. C. §§ 1253, 2101 (b)); we postponed consideration of the question of jurisdiction until a hearing on the merits. 369 U. S. 882.

We have jurisdiction of this appeal if the case was "required . . . to be heard and determined by a district court of three judges." 28 U. S. C. § 1253. The question whether the Georgia regulatory scheme is unconstitutional because it burdened the exercise by the United States of its power to maintain a civilian service and to carry out other constitutional functions is a substantial one, as our decisions in *Penn Dairies, Inc.,* v. *Milk Control Comm'n, supra; Public Utilities Comm'n of California* v. *United States,* 355 U. S. 534, and *Paul* v. *United States, ante,* p. 245, decided this day, show, and therefore required a three-judge court to adjudicate it. 28 U. S. C. § 2281; *Idlewild Bon Voyage Liquor Corp.* v. *Epstein,* 370 U. S. 713; *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73. We have presented here more than an isolated issue whether a state law conflicts with a federal statute and therefore must give way by reason of the Supremacy Clause. Cf. *Kesler* v. *Department of Public Safety,* 369 U. S. 153. Direct conflict between a state law and federal constitutional provisions raises of course a question under the Supremacy Clause but one of a broader scope than where the alleged conflict is only between a state statute and a federal statute that might be resolved by the construction given either the state or the federal law. *Id.,* 157. So we have a clear case for convening a three-judge court. Once convened the case can be disposed of below or here on any ground, whether or not it would have justified the

calling of a three-judge court. See *Sterling* v. *Constantin,* 287 U. S. 378, 393–394; *Railroad Comm'n* v. *Pacific Gas Co.,* 302 U. S. 388, 391.

The District Court, acting on motions for summary judgment filed by each of the parties, said that were the property being transported "strictly governmental property," the case would be governed by *Public Utilities Comm'n of California* v. *United States,* 355 U. S. 534. But since the property involved here is household goods, not military supplies, the court concluded that the case is controlled by *Penn Dairies, Inc.,* v. *Milk Control Comm'n, supra.*

The distinction drawn by the District Court between this case and *Public Utilities Comm'n of California* v. *United States, supra,* is not tenable. Between 1943, when *Penn Dairies* was decided, and 1958, when *Public Utilities Comm'n of California* was decided, Congress enacted the Armed Services Procurement Act of 1947, 62 Stat. 21, later codified without substantial change, 70A Stat. 127, 10 U. S. C. § 2301 *et seq.,* which extended and elaborated the federal procurement policy of negotiated rates which, as we noted in the *Public Utilities Comm'n of California* case, conflicted with California's policy of regulated rates. 355 U. S., at 544. The federal Regulation involved in that case was superseded in 1958 by the Military Traffic Management Regulation.[2] That Regulation includes the "procedures to govern the movement of uncrated household goods."[3] Another Regulation provides that their transportation is authorized "by the mode of transportation . . . which results in the lowest over-all cost to the Government and which provides the required service satisfactorily."[4] This entails "negotiation" with

---

[2] Promulgated March 1958, as amended to October 10, 1960.

[3] *Id.,* c. 101, ¶ 101001.

[4] Joint Travel Regulations, c. 8, April 1, 1959, as amended to October 1, 1961, ¶ 8001.

carriers for "rates" [5] on military traffic and "Special arrangements pertaining to other freight traffic." [6] Examples could be multiplied but enough has been said to show that the new Military Traffic Management Regulation continues in effect the provisions of the earlier regulation in force when the *Public Utilities Comm'n of California* case was decided.

The same policy of negotiating rates for shipment of federal property now governs nondefense agencies. The basic statute is the Federal Property and Administrative Services Act of 1949, 63 Stat. 383, 40 U. S. C. § 481, 63 Stat. 393, as amended, 41 U. S. C. § 251 *et seq.* Its procurement provisions are substantially similar to those contained in the Armed Services Procurement Act of 1947. It was, indeed, enacted to extend to GSA "the principles of the Armed Services Procurement Act of 1947, with appropriate modifications principally designed to eliminate provisions applicable primarily to the military." H. R. Rep. No. 670, 81st Cong., 1st Sess., p. 6. Under the regulations promulgated pursuant to this Act, procurement of transportation and improvement of transportation and traffic practices of executive agencies are entrusted to the Commissioner of the Transportation and Public Utilities Service (TPUS). [7] He is to represent the executive agencies "in negotiations of rates and contracts for transportation." [8] The Commissioner in procurement and contracting [9]

> "(a) Negotiates purchases and contracts for property and services without advertising, and makes any

---

[5] Military Traffic Management Regulation, amended to November 5, 1959, c. 201, ¶ 201001 (b).

[6] *Id.,* ¶ 201001 (k).

[7] General Services Adm. Order, ADM 5450.3, change 4, ¶ 141a; TPS 7460.1, Attachment, ¶ 3, March 15, 1960.

[8] ADM, *supra,* ¶ 141b; TPS 7460.1, ¶ 4.

[9] *Id.,* ¶ 142a.

determinations and decisions required in connection therewith . . . .

"(b) Makes purchases and contracts for property and services by advertising, and determines that the rejection of all bids is in the public interest.

"(c) Determines the type of negotiated contract which will promote the best interests of the Government . . . ."

The Regulation governing the Commissioner's functions enjoins him:

"to evaluate mass movements of household goods and personal effects and, when feasible, to negotiate with carriers to effect the most economical basis for the movement of such household goods and personal effects." [10]

"Except when the exigency of the movement precludes such action, all requests for rates for mass movements . . . shall be made by formal advertising [for bids] . . . ." [11]

That Regulation is plainly within the purview of the Act, which provides in § 302, as amended, 41 U. S. C. § 252, as follows:

"All purchases and contracts for property and services shall be made by advertising, as provided in section 253 of this title, except that such purchases and contracts may be negotiated by the agency head without advertising if—

.        .        .        .        .

"(2) the public exigency will not admit of the delay incident to advertising;

.        .        .        .        .

---

[10] TPS 7460.1, ¶ 3.

[11] *Id.*, Attachment, ¶ 7b (1).

"(10) for property or services for which it is impracticable to secure competition;

. . . . .

"(14) for property or services as to which the agency head determines that bid prices after advertising therefor are not reasonable . . . or have not been independently arrived at in open competition: *Provided,* That . . . (B) the negotiated price is the lowest negotiated price offered by any responsible supplier . . . ."

Section 253 (b) provides that awards shall be made "to that responsible bidder whose bid . . . will be most advantageous to the Government, price and other factors considered." Moreover, 40 U. S. C. § 481 (a)(4) directs GSA to represent executive agencies "in negotiations with carriers" with respect to transportation "for the use of executive agencies." Transfer of household goods of federal employees, whether military [12] or civilian, has been made by Congress a charge against federal funds when employees are transferred from one official station to another.[13]

It is said that the 1949 Act gives the Administrator power to deal only with whoever has authority to make rate decisions, whether it be the carrier on interstate shipments or the state regulatory agency on intrastate shipments. 40 U. S. C. § 481 does indeed provide:

"The Administrator shall, in respect of executive agencies, and to the extent that he determines that so doing is advantageous to the Government in terms of economy, efficiency, or service, and with due regard to the program activities of the agencies concerned—

. . . . .

---

[12] 63 Stat. 813, as amended, 37 U. S. C. § 253 (c).
[13] 60 Stat. 806, as amended, 5 U. S. C. § 73b–1.

"(4) with respect to transportation and other public utility services for the use of executive agencies, represent such agencies *in negotiations with carriers* and *other public utilities* and in *proceedings involving carriers or other public utilities before Federal* and *State regulatory bodies* . . . ." (Emphasis added.)

But that provision does not say that state-fixed rates govern the federal procurement official unless he can get them changed. It is comparable to § 22 of the Interstate Commerce Act, 49 U. S. C. § 22, which allows the United States to obtain preferred rates. "The object of the section was to settle, beyond doubt, that the preferential treatment of certain classes of shippers and travelers . . . is not necessarily prohibited." *Nashville R. Co.* v. *Tennessee,* 262 U. S. 318, 323. And see *Southern R. Co.* v. *United States,* 322 U. S. 72; *United States* v. *Interstate Commerce Comm'n,* 352 U. S. 158, 174.

By § 481 (a) the Administrator is authorized to seek before state agencies preferential treatment for federal shipments. But there is not a word suggesting that, failing in that regard, he is bound to accept the state-fixed rate. The Act and the Regulation speak too clearly in terms of the "lowest over-all cost" to the Government, either through competitive bidding or negotiation with carriers, for us to conclude that the only relief against state fixed rates is an administrative remedy before the state agency either through negotiation or litigation. Congress has not tied the hands of the federal procurement officials so tightly.

We have then a federal procurement policy of negotiated rates for transporting household goods of federal employees—a policy as clear and as explicit as the federal policy for transporting military supplies involved in *Public Utilities Comm'n of California* v. *United States,*

*supra.* The Georgia policy, which is opposed to this federal policy, must accordingly give way. For as we noted in *Public Utilities Comm'n of California* v. *United States, supra,* at 544, a State is without power by reason of the Supremacy Clause to provide the conditions on which the Federal Government will effectuate its policies. Whether the federal policy is a wise one is for the Congress and the Chief Executive to determine. See *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 127 *et seq.* Once they have spoken it is our function to enforce their will.

*Reversed.*

MR. JUSTICE STEWART, whom MR. JUSTICE HARLAN and MR. JUSTICE GOLDBERG join, dissenting.

The governing law in this case is Title III of the Federal Property and Administrative Services Act of 1949,[1] but that Act simply "extends to the General Services Agency the principles of the Armed Services Procurement Act of 1947." [2]  In *Paul* v. *United States, ante,* p. 270, I have stated why I think those principles clearly contemplate that government procurement is to be conducted within the framework of valid state regulatory legislation. For the reasons there stated, I also dissent from the Court's judgment in this case.

Only one additional consideration needs mention here. The Court purports to find some additional support for the result in this case in one provision of the 1949 Act which has no counterpart in the 1947 Act. Section 201 (a) of the 1949 Act [3] provides, in pertinent part,

"(a) The Administrator shall . . .

.          .          .          .          .

---

[1] 63 Stat. 393, as amended, 41 U. S. C. §§ 251–260.

[2] H. R. Rep. No. 670, 81st Cong., 1st Sess. 6.

[3] 63 Stat. 383, as amended, 40 U. S. C. § 481 (a).

"(4) with respect to transportation and other public utility services for the use of executive agencies, represent such agencies *in negotiations with carriers and other public utilities* and *in proceedings involving carriers or other public utilities before Federal and State regulatory bodies* . . . ." (Emphasis added.)

The Court seizes upon the words "in negotiations with carriers" as evidence that Congress authorized the Administrator to by-pass state rate schedules when placing contracts for intrastate transportation.

Far from supporting the Court's position, I think § 201 (a) is simply another example of Congress' basic assumption that state price regulation will remain applicable to federal procurement transactions. The section refers both to negotiations with individual carriers and to proceedings before regulatory agencies. It seems to me that the authorization of these alternative procedures must be read against the background of § 22 of the Interstate Commerce Act, 49 U. S. C. § 22, which provides that I. C. C. rate schedules governing interstate shipments are not to apply to transportation for the Federal Government. In light of this express statutory exemption for interstate shipments, it appears quite clear that § 201 (a) says nothing more than that the Administrator has power to deal with whoever has authority to make rate decisions—with the carrier for interstate shipments, and with state regulatory agencies for intrastate shipments when regulated by state law.[4]

---

[4] The same conclusion must be drawn from the several regulations cited by the Court. When read in full, both the military and civilian transportation regulations seem to anticipate that procurement officers will deal sometimes directly with individual carriers, and some-

times with a regulatory body. The Executive Director, Military Traffic Management Agency, is made responsible for:

"Negotiation with all for-hire carriers of cargo or their rate-making agencies for classifications, rates, charges, rules and regulations on military traffic . . . ." Chapter 201, Military Traffic Management Regulation, March 1958, as amended to November 5, 1959.

Similarly, regulations governing nonmilitary transportation make the Transportation and Public Utilities Service responsible for:

"the provision of advice and expert testimony on behalf of executive agencies in proceedings before Federal and State regulatory bodies involving transportation, public utilities [and] communications . . . ." General Services Adm. Order, ADM 5450.3, Change 4, July 31, 1959, § 1, ¶ 141 (b).