

# THE ATTORNEY GENERAL
## OF TEXAS

**JOHN L. HILL**
**ATTORNEY GENERAL**

AUSTIN, TEXAS 78711

September 25, 1973

Overruled by H-1367
[signature]

The Honorable Ivan Williams
Executive Director
Texas Amusement Machine Commission
P. O. Box 13226 Capitol Station
Austin, Texas 78711

Dear Mr. Williams:

Opinion No. H-110

Re: The applicability of regu-
latory Article 13.02 to
coin-operated machines
on U.S. military installa-
tions in Texas

On behalf of the Texas Amusement Machine Commission you have
requested the opinion of this office about the application of Article 13.02(2),
V. T. C. S., in connection with a controversy involving the Army and Air
Force Exchange Service. Your letter explains:

"The Texas Vending Commission was created
by Senate Bill 268, [Acts 1971, 62nd Leg., R.S.,
p. 1942, ch. 587] . . . . Section 2 of S. B. 268
transfers to the Texas Vending Commission [subse-
quently renamed the Texas Amusement Machine
Commission, Acts 1973, 63rd Leg., R. S., p. 362,
ch. 159] all of the functions previously exercised by
the State Comptroller under Chapter 13, [V. T. C. S.],
Taxation-General, as amended.

"Subsection 2, Article 13.02, [V. T. C. S.],
Taxation-General provides in part as follows:

'No owner shall agree or contract with a bailee
or lessee of a coin-operated machine to compen-
sate said bailee or lessee in excess of fifty per-
cent (50%) of the gross receipt of such machine
after the above reimbursement has been made.
In addition to all other penalties provided by law,
the [Texas Amusement Machine Commission]

> . . . shall revoke any license held under Article 13.17 by any person who violates this subsection.'

"This specific statutory provision has been declared valid by the court [Thompson v. Calvert, 489 S.W. 2d 95 (Tex. 1973)].

"The United States Army and Air Force Exchange Service has taken the position that the subject statutory provision may not be enforced by this Commission against the Army and Air Force Exchange Service."

You note:

". . . the Army and Air Force Exchange Service purchases goods and services from 'non-appropriated funds' and . . . the Army and Air Force Exchange Service is a civilian rather than a military operation of the Department of Defense."

You then ask:

"1. Whether the provisions of Subsection 2, Article 13.02, [V.T.C.S.], Taxation-General may be enforced by this commission against a licensee-owner under this act who contracts with a U.S. military post exchange, U.S. military service club or some other lessee of coin-operated machines when the lessee is physically located on lands [over] which the State of Texas [has] ceded exclusive jurisdiction to the United States, reserving only jurisdiction to execute judicial process there?

"2. What would be your answer to question No. 1 if such lessee was physically located on lands not ceded or ceded only in part by the State of Texas to the United States?

"3. Would the fact that some lessees of coin-operated machines which are physically located on U.S. military installations contract to purchase goods and services from 'appropriated funds' while others do so from 'non-appropriated funds' have any effect on your answer?"

Your questions are broader than your premise, since the term "lessee" used in your first question applies to persons or entities other than the Army and Air Force Exchange Service, but we will answer in the broader context. The questions involve two different clauses of the federal Constitution.

Article 1, §8, Clause 17 of the Constitution of the United States reads, in part:

"The Congress shall have power. . . to exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings . . . ."

Article 6, cl. 2, the so-called Supremacy Clause, provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

Our system is one of dual sovereignty. Though the federal government may acquire land within a State by purchase or condemnation without the consent of the State, in the absence of such consent, the United States does not become an <u>exclusive</u> sovereign as authorized by Article 1, §8, cl. 17, and its

possession is regarded as that of an ordinary proprietor. Any "consent" given by a State may be conditioned upon its retention of jurisdiction over the land consistent with the federal use, but when consent has been given, if a portion of the State's jurisdiction is not expressly retained (or to the extent that it is not retained), the jurisdiction of the federal government becomes "exclusive" if the federal government assents to the transfer of the jurisdiction. If the State's legislative jurisdiction is not retained, subsequent laws of the State have no force in a federal enclave. However, state laws applicable at the time of transfer remain in effect, until abrogated, to assure that no area is left without a developed system for private rights. Paul v. United States, 371 U.S. 245 (1963). See Adams v. Calvert, 396 S.W. 2d 948 (Tex. 1965).

In ceded areas where only the jurisdiction to execute judicial process has been reserved, the applicability of Article 13.02, Taxation General, V.T.C.S., to private persons depends upon whether the basic provisions of that law were in force at the time the land was ceded, and whether it has been abrogated by federal law. We are aware of no federal legislation or policy which abrogates such laws as they might apply to private persons in such circumstances.

However, U.S. Military Post Exchanges and U.S. Military Service Clubs operated by the Army and Air Force Exchange are not purely private personages. The Exchange Service evolved from the original "sutler" system of provisioning armies. Its establishment has never rested on statutory law, but, rather, on General Orders of the War Department and, now, Regulations issued by authority of the Secretary of Defense. See 8 JAG L. Rev. 19, Scolnick and Packer, Evolution of the Army and Air Force Exchange Service (1966).

Post Exchanges and Service Clubs are instrumentalities of the federal government, though some might classify them as "civilian" rather than "military," and though they are operated exclusively with "non-appropriated" funds. Standard Oil Co. v. Johnson, 316 U.S. 481 (1942). Compare Paul v. United States, supra. And see United States v. State Tax Commission of Mississippi., _____ U.S. _____, 37 L. Ed 2d 1 (1973).

Paul v. United States was decided January 14, 1963. It involved the right of the State of California to enforce minimum wholesale price regulations with respect to milk sold at three U.S. military installations in California and used for three different purposes; for strictly military consumption, for resale at federal commissaries, and for consumption or resale at various military clubs and post exchanges. Milk for the first two uses was paid for with appropriated funds while that to be used or resold at the clubs and exchanges was not.

The Supreme Court held that, as to milk paid for with appropriated funds (and without regard to "jurisdiction" questions), the federal policy set by 10 U.S.C. § 2301, et seq., and the Armed Services Procurement Regulations promulgated pursuant thereto, required competitive bidding. Milk purchased for military consumption and for resale at federal commissaries was purchased with appropriated funds. The Supreme Court held, therefore, that the Regulations promulgated pursuant to the statutes were to be given the force of law and took precedence over any contrary state laws.

But milk purchased for consumption or resale at the various military clubs and post exchanges was purchased with non-appropriated funds. The Court, through Justice Douglas, observed that "[t]here is no. . . conflicting federal policy concerning purchases and sales from non-appropriated funds" and concluded that California's current price controls over milk were applicable to such sales, provided the basic State law authorizing such control had been in effect since the times of the various acquisitions of ceded areas.

In other words, exchanges and clubs using non-appropriated funds were to be considered subject to the State law to the same extent as private persons in the same circumstances would be subject to it.

Subsequent to the decision in Paul v. United States, new regulations applicable to the Army and Air Force Exchange Service have been promulgated, stating that the A & A F E S is immune from direct State taxation and from State regulatory laws, such as licensing and price control statutes, whose application would result in interference with the performance by the A & A F E S of its assigned Federal functions. (32 C.F.R., § 554.6). And

see 32 C. F. R., § 554. 9, purporting to require full competition in procurement "consistent with the immunity of exchanges from State regulations and control. "

The above A & A F E S Regulations have no statutory basis other than that contained in 10 USC 3012 (g) conferring upon the Secretary of the Army power to "prescribe regulations to carry out his functions, powers and duties. . . ."

In Paul v. United States, the Supreme Court specifically noted that the provisions of 10 USC 2301 et seq., relating to Defense Department procurement and which authorized the adoption of Regulations making State price controls inapplicable, were themselves applicable only to purchases made with appropriated funds; it found no existing federal policy of immunity for the Exchange Service against the enforcement of State price controls where only non-appropriated funds were concerned. We have found no later-enacted federal statutes applicable to the Army and Air Force Exchange Service which would change that policy.

Congress authorized immunization from State price controls for purchases made under the authority of the Department of Defense only as respects purchases made with appropriated funds. The express application of those statutes only to payments made from appropriated funds impliedly excludes from their policy operation those payments made from non-appropriated funds. The Secretary of the Army was without the power or authority to extend that immunization policy beyond the limits set by Congress, and we think the above A & A F E S Regulations attempting to do so are nullities in that respect. See Hirshberg v. Cooke, 336 U.S. 210 (1949).

In Penn Dairies v. Milk Control Commission, 318 U.S. 261 (1943) the Supreme Court, after considering another "milk" price control case under statutory and administrative provisions antecedent to (but different from) those concerned in Paul v. United States, said (at p. 621):

". . . [T]hose burdens [state taxation and regulation], save as Congress may act to remove them, are to be regarded as the normal incidents of the operation

within the same territory of a dual system of
government, and . . . no immunity of the national
government from such burdens is to be implied
from the Constitution. . . .

"Even in the case of agencies created or
appointed to do the government's work we have
been slow to infer an immunity which Congress
has not granted and which Congressional policy
does not require."

Also see Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361
(1964). Compare United States v. Georgia Public Service Commission,
371 U.S. 285 (1963), and Public Utilities Commission of the State of
California v. United States, 355 U.S. 534 (1958).

We conclude that the more recent A & A F E S Regulations attempting
to extend the immunity from State regulations are ineffective to give immu-
nity to non-appropriated fund activities and that contracts made by the Army
and Air Force Exchange Service with such funds are subject to the provisions
of Article 13.02 (2), Taxation General, V. T. C.S., in the same manner as
contracts of a private individual or corporation. As to ceded areas, immu-
nity will depend upon the cession agreement, the statute's basic existence
prior thereto, and federal abrogations thereof.

Adams v. Calvert, 396 S. W. 2d 948 (Tex. 1965), involved the right of
the State to tax the interests of a private individual in coin-operated machines
located at Fort Hood. The taxes were levied under Article 13.02. The
Supreme Court said:

"It thus appears that at the time the Fort Hood
lands were acquired by the United States there were
both federal and state limitations on the authority of
the Governor of Texas to reserve jurisdiction to the
State over the lands. By the federal law the Governor
could reserve all jurisdiction over the lands consistent
with the federal uses, but no more, and by Article 5427

> the Governor was <u>required</u> to reserve <u>only</u> juris-
> diction to execute state judicial process anywhere
> on the lands. There is no sound reason for saying
> that the authority conferred on the Governor by
> Art. 5247 to cede exclusive jurisdiction does not
> include authority to cede a lesser jurisdiction. We
> hold, therefore, that in the area between the maxi-
> mum permitted by federal law and the minimum
> required by Article 5247, the extent of jurisdiction
> reserved to the State over lands acquired by the
> United States with the consent given in Article 5242
> is, in the absence of other limitations, a matter for
> negotiation by the Governor and is settled and con-
> cluded by his deed of cession. . . ." (396 S. W. 2d
> at 950).

Your first question assumes that as to the lands involved the State
has "ceded exclusive jurisdiction to the United States, reserving only
jurisdiction to execute judicial process there." Our answer to your first
question, therefore, is that, absent a reservation of jurisdiction over
matters not in conflict with federal jurisdiction, the State has no power
and the price control aspects of Subsection 2, Article 13.02, Taxation-
General, V. T. C. S., may not be enforced on such a post.

Your second question asks whether our answer would be different
if the lessee was physically located on lands not ceded or ceded only in
part by the State of Texas to the United States. If the lands were not
ceded at all, our answer would be that the State would have the same rights
as to the lessee as it would have to any other lessee. If they were ceded in
part only, the jurisdiction of the State would have to depend upon the cession
agreement in each case; thus, we cannot give an unequivocal answer.

The answer to your third question would be that as to machines or
services purchased with appropriated funds, the State price control regu-
lations would conflict with the Federal Procurement Act and the Federal
statute would prevail. As to those purchased with "non-appropriated funds,"
the answer could differ depending upon whether the machines were located

on or off ceded property and, if on ceded property, the terms of the cession agreement would control.

## SUMMARY

Jurisdiction of the Texas Amusement Machine Commission over coin-operated machines located upon Federal bases will depend upon the following principles: (1) If acquired with appropriated funds, state regulation is totally ineffective; (2) If acquired with non-appropriated funds and located on ceded land, the extent of the State's jurisdiction will depend upon the terms of the cession agreement and the State law in existence at the time of cession; and (3) If located on land which has not been ceded to the United States and acquired with non-appropriated funds, the jurisdiction of the Commission will be complete.

Very truly yours,

JOHN L. HILL
Attorney General of Texas

APPROVED:

LARRY F. YORK, First Assistant

DAVID M. KENDALL, Chairman
Opinion Committee