**SWEET BRIAR INSTITUTE, Plaintiff,**

v.

**Robert Y. BUTTON, Attorney General for the Commonwealth of Virginia, et al., Defendants.**

**Civ. A. No. 66–C–10–L.**

United States District Court
W. D. Virginia,
at Charlottesville.

Argued July 6, 1966.

Decided July 14, 1967.

Frank G. Davidson, Jr., Lynchburg, Va., and Thomas S. Currier, Charlottesville, Va., for plaintiff.

Robert Y. Button, Atty. Gen. of Virginia, Richmond, Va., and William M. McClenny, Commonwealth's Atty., Amherst County, Virginia, for defendants.

Before BRYAN, Circuit Judge, and MICHIE and BUTZNER, District Judges.

ALBERT V. BRYAN, Circuit Judge:

On the appeal of Sweet Briar Institute, our order of abstention was reversed by the Supreme Court with directions for consideration of the case on its merits. The present posture of the suit is, then, that it stands sub judice for decision on the original submission. Because our first opinion [see Appendix] recited the history of the litigation, the material facts and the adversary contentions, we go immediately to the issue at hand: whether the State of Virginia may enforce the provision in the will of the founder of the college restricting enrollment to "white girls and young women".

We conclude it cannot. The State cannot require compliance with the testamentary restriction because that would constitute State action barred by the Fourteenth Amendment. This was the express holding in the Girard case, Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957).

A permanent injunction will be issued accordingly.

## APPENDIX

ALBERT V. BRYAN, Circuit Judge:

A racial restriction limiting the students who could be admitted to Sweet Briar College, Virginia, to "white girls and young women" was imposed by the will of Indiana Fletcher Williams which created the trust whereby the institution was established and has been operated since 1906. The college, now chartered by Virginia as a non-stock, non-profit corporation and as such a testamentary trustee, brought this suit to have enforcement of the restriction enjoined and the stipulation declared unlawful.

To this end the complaint alleges invalidity in the restriction on the ground that it offends the equal protection clause of the Fourteenth Amendment; the Civil Rights Act of 1964, 42 U.S.C. § 2000a–1 through 2000a–6; and the recent pronouncements of the

United States Supreme Court outlawing invidious racial or color distinctions. Further allegations aver serious detriment to the college, both economic and educational, by reason of the racial stipulation.

Defendants to the complaint are the Commonwealth's Attorney of Amherst County, in which the college is located, and the Attorney General of Virginia. They are charged by law with the enforcement of the terms of charitable trusts existing in the State, such as that embodying Sweet Briar College. The complaint prays injunction of these officers from prosecuting any suit to effectuate the restriction.

The Williams will, dated April 3, 1899, was duly probated in Virginia in 1901. It directed the organization of a corporation to receive a devise of large tracts of land and a generous legacy of moneys, constituting the trust estate, as follows:

"The said corporation shall be formed with the object and with the power of establishing and maintaining within the State of Virginia, a school or seminary for the education of white girls and young women * * *.

"2. Immediately upon the formation and organization of such corporation, the said trustees [under the will] shall grant and convey, and I hereby give and devise, the said * * * property * * * to the said corporation, to have and to hold the same unto it, and its successors forever, upon the conditions and for the purposes hereinafter declared, which it shall accept and assume, namely: the said corporation shall with suitable dispatch establish and shall maintain and carry on upon the said plantation a school or seminary, to be known as the 'Sweet Briar Institute', for the education of *white girls and young women*. It shall be the general scope and object of the school to impart to its students such education in sound learning, and such physical, moral and religious training as shall in the judgment of the directors best fit them to be useful members of society * * *." (Accent added.)

These provisions were carried into the corporate charter.

Before the commencement of this suit the directors of the college adopted resolutions proposing the acceptance of students without reference to race. After submission of the case to the court, Sweet Briar put this policy into effect by matriculating a Negro applicant. It also accepted Federal grants of moneys in the way of scholarships and other aid which are granted only to colleges not maintaining segregation by race or color.

The college's attack, mounted on the Fourteenth Amendment, is pointed at the racial restriction as one permitted and compelled by State action, in that in both aspects it is predicated on the immanent proscriptions of section 55–26, Code of Virginia of 1950. This statute and its predecessors validate charitable trusts for education, which were not permitted prior to this legislative approval. The highest court of Virginia construed this law, in Triplett v. Trotter, 169 Va. 440, 193 S.E. 514 (1937), to mean that an institution so created cannot admit both white and Negro students, but its admissions must be limited exclusively to one or the other race. Another target of attack on the same ground is section 140 of the Virginia Constitution forbidding the education of white and Negro scholars in the same school.

Plaintiff avers that the defendant State officials threaten to employ these racial prohibitions to force Sweet Briar to adhere to the will's racial restriction. The college also alleges that the Civil Rights Act of 1964, sections 202 and 203, 42 U.S.C. §§ 2000a–1 and 2, precludes the requirement of racial discrimination.

Two years prior to the April 1966 commencement of this suit, the college filed an action against the same defendants in the Circuit Court for Amherst County, asking for judicial guidance of the plaintiff in the administration of its trust when facing both the restriction and its alleged detriment to the success

of the college and its ability to achieve the aims of the will. There the plaintiff also attacked the restriction as violative of the Fourteenth Amendment.

At the time the present suit—the Federal case—was begun, the Circuit Court Judge had announced that he would dismiss the case before him because he found no occasion for the suit. The decree followed. However, he allowed the college to amend its complaint, and the cause now stands for hearing on the amendment.

Relying upon the plaintiffs' election to proceed first in the State court, the present pendency of that case and the decision rendered therein, the defendant officials moved for dismissal of the Federal suit, or for abstention here from further proceedings until the college had carried its case through the State courts, trial and appellate. After considering the record and the arguments of counsel, on brief and orally, we have decided to abstain.

■ This course is dictated *first* because the law does not allow the prosecution of a second suit after a concomitant suit has been decided. *Next*, it is dictated by the established principle that the Federal courts should not pass upon controversies primarily dependent for solution upon local law until the State courts have ruled upon them in consideration of the Federal grounds of attack. *Thirdly*, only through abstention here can the college procure a complete answer to its desire for a judicial ruling upon the present vitality of the restriction.

■ I. Precedent permits the pendency of two contemporaneous in personam actions between the same parties, one in the State and one in the Federal court, but an adjudication of the same issue in one of them automatically bars the other as res judicata. That Sweet Briar's State suit has already presented the same issues as are tendered now is plain. This is acknowledged by the college in excepting to the State decision on the ground that the State court had not passed on the Federal questions raised in the suit. Particularly, both suits pleaded the Fourteenth Amendment and both were submitted while the Civil Rights Act was in the comprehension of the court and counsel. The State court decision, in effect upholding the racial restriction, was announced almost a year before the Federal suit was filed.

■ A justification urged for maintenance of the Federal suit is the asserted delay of the State judge in entering a formal decree implementing his decision. However, the necessary order was entered at about the same time as the Federal case was instituted. Moreover, we have no jurisdiction to police a State court in setting down its pronouncements. The remedy for unreasonable delay, if any there be, is well within the powers of the State judiciary.

■■ It is almost cavil to attempt to justify the Federal suit on the assertion that the State court refused or failed to decide the Federal questions. They were all noted, even if not discussed, by the State judge, and the case tendering them was held to be without merit. Right or wrong it was an unequivocal denial of the Federal claims. A direction for dismissal of a complaint is just about the most explicit and definitive determination of the claims therein as is conceivable.

■ A contrary conclusion cannot succeed because of the absence from the demurrer, on which the State court decided the controversy, of a specific mention of either the Federal Constitution or the Civil Rights Act. In Virginia, as elsewhere generally, a ruling sustaining a demurrer, save when raising only a procedural point, is a decision on the merits. It precludes relitigation of the disputed matters. Not only that, it is conclusive upon any contention which *could have been urged by the plaintiff although it was not.* The basis of this rule is quite understandable—it prevents vexation of a defendant through repeated trials. The principle was clearly enunciated in Griffin v. Griffin, 183 Va.

443, 32 S.E.2d 700, 702 (1945), the Court saying:

" 'When the second suit is between the same parties as the first, and on the same cause of action, the judgment in the former is conclusive of the latter not only as to every question which was decided, *but also as to every other matter which the parties might have litigated and had determined,* within the issues as they were made or tendered by the pleadings or as incident to or essentially connected with the subject matter of the litigation, whether the same, as a matter of fact, were or were not considered. As to such matters a new suit on the same cause of action cannot be maintained between the same parties.' 4 A.L.R. 1174, note. A general demurrer which denies the right of the plaintiff to recover on the cause of action alleged, which is sustained, is a decision on the merits. \* \* \* " (Accent added.)

This doctrine was expounded, too, in Tomiyasu v. Golden, 358 F.2d 651, 653 (9 Cir. March 1966) in these words:

"Appellants' contention that a federal right has been violated rests on the allegation that the Nevada statute providing for foreclosure sales under deeds of trusts, as applied to appellants, deprived them of their property without notice and a fair hearing. This is precisely the basis upon which recovery was sought under state law in the state courts. By merely failing to raise the constitutional issue in the state action, appellants could not preserve for themselves the right to enter a federal court at a later date upon the same facts, alleging the same wrong, and seeking the same recovery, simply because they present a new theory of relief based upon the Constitution. \* \* \* If appellants have had one chance to litigate the issues they now raise here, they have had the process which the state owes them and the Constitution secures to them."

Support for this view was found by the Ninth Circuit in Angel v. Bullington, 330 U.S. 183, 188–189, 67 S.Ct. 657, 91 L.Ed. 832 (1947).

■ The allowance of the college's amendment did not destroy the res judicata effect of the State court's decision *in respect to the Federal cause.* Restatement of Judgments, § 41, Comment (d), p. 163. The decree of the Amherst Circuit Court unequivocally dismissed the case. Leave to amend is no more than the consent of the court to hear further argument; it does not ipso facto suspend the decision embedded in the decree. The resolution of the case remains as stated until the decree is vacated. Actually, the amended bill here introduced no ground of argument not available to the college from the beginning, including § 55–26, Code of Virginia, and the Civil Rights Act of 1964. But whether or not the original State decision is sufficiently final to constitute res judicata, the fact is that the State case was the first to go to decision, and on reaching that stage it should preclude the further prosecution of the Federal case, at least until carried through the State court of last resort.

### Dismissal Warranted

Under England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) we could dismiss the case. Save for appellants' misunderstanding there of the holding in Government and Civic Employees, etc. v. Windsor, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957) the Court stated that the Federal suit would have been dismissed, once the State court had taken the case and decided it in its entirety. Although cited by plaintiff to sustain its procedure, the plaintiff's course here is diametrically opposed to that approved in *England.* There the suit was commenced in the Federal court but remitted by that court to the State court. Here the plaintiff has done just the reverse, a maneuver sharply disapproved by the Supreme

Court. Apt here is this part of the *England* opinion:

> "But we see no reason why a party, after unreservedly litigating his federal claims in the state courts although not required to do so, should be allowed to ignore the adverse state decision and start all over again in the District Court. Such a rule would not only countenance an unnecessary increase in the length and cost of litigation; it would also be a potential source of friction between the state and federal judiciaries. We implicitly rejected such a rule in *Button* [N.A.A.C.P. v. Button, 371 U.S. 415, [83 S.Ct. 328, 9 L.Ed.2d 405] (1963)], when we stated that a party elects to forgo his right to return to the District Court by a decision 'to seek a complete and final adjudication of his rights in the state courts.' We now explicitly hold that if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then—whether or not he seeks direct review of the state decision in this Court—he has elected to forgo his right to return to the District Court."

375 U.S. at 418–419, 84 S.Ct. at 467.

Obviously, then, the plaintiff is not entitled to proceed now in the Federal court. Indeed, we think *England* almost compels dismissal. However, to avoid the possibility of injury to the plaintiff, we prefer to defer final disposition of this case until plaintiff's claims have been put before the State courts completely.

 II. Because the State courts had already advanced to a full determination of all the issues, comity between the Federal and State judiciaries forcefully directs that we abstain in favor of the State court—stay our hand. Alabama Public Service Commission v. Southern R. Co., 341 U.S. 341, 350, 71 S.Ct. 762, 95 L.Ed. 1002 (1950); Glen Oaks Utilities, Inc. v. City of Houston, 280 F.2d 330, 334 (5 Cir. 1960);

Reid v. City of Norfolk, 179 F.Supp. 768, 773 (E.D.Va.—3-judge court —1960). Comity in these circumstances is quite unlike a deference exercised only because of the mere concomitance of the State suit—it is rather a refusal to frustrate a State judicial determination complete for all practical purposes.

 The paramount ground for abstention, however, is that the resolution of conflicting views under the State law is the exclusive province of the State courts until a Constitutional question develops. But even then the question *must first* be left to the State courts to consider and decide it "in light of the constitutional objections presented to the [Federal court]". Government and Civic Employees, etc. v. Windsor, 353 U.S. 365, 366, 77 S.Ct. 839 (1957). See City of Meridian v. Southern Bell T. & T. Co., 358 U.S. 639, 640, 79 S.Ct. 455, 3 L.Ed. 2d 562 (1959); Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 104, 65 S.Ct. 152, 89 L.Ed. 101 (1944). In *Windsor* the decision was reversed because the complainant had not submitted the Federal issues to the State court.

 The wisdom of this policy is now sharply exampled. Although in the Federal suit no ambiguity in the will is explicitly alleged nor guidance in administration specifically asked, in actuality both are pleaded. Instead of calling the testamentary restriction an ambiguity, it is described as an ineffective provision, and the college plainly desires to be advised on how to treat it in the operation of the institution. The action is brought by Sweet Briar as a testamentary trustee, administering its trust according to the law of Virginia, and it involves a question of statewide importance to Virginia: whether a private benefactor may establish and operate in the State a school exclusively for Negro or exclusively for white students. Thus it is particularly fitting that the adjudication be made primarily by Virginia courts. If that course had been pursued, the initial suit would have led to the desired end: a declaration, with an ultimate Federal review, upon the effectiveness

of the racial restriction when apposed to State enforcement and when apposed to the action of others. The results might well be different in the two aspects. Review of the decision upon the Federal points would be available in the United States Supreme Court or in this court.

Sweet Briar's counsel cannot be serious in urging that §§ 202, 203 and 207 of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–1, 2000a–2, 2000a–6, prevent abstention of the Federal court until the State court acts, for such a suspension by the Federal court was suggested by the college. In its amended bill of complaint in the State court, Sweet Briar explained that "it is exposing its Federal claims" to the *State* court while the Federal suit is pending. Furthermore, the cited sections of the Civil Rights Act of 1964 reveal in themselves that they refer solely to the exercise and denial of rights possessed by the public. See Sec. 201(e). The right to enter Sweet Briar is certainly not a public right.

Indeed, the net effect of the plaintiff's procedure is to acknowledge the obligation of submitting the issue primarily to the State court. The following recital of the procedure discloses this intention:

(1) First, the Federal and State questions were initially submitted to the Circuit Court of Amherst County and there decided;

(2) Later, on the same grounds included in the State suit, plaintiff began this additional action in the Federal court;

(3) Then plaintiff amended the State complaint and asked the State court to *"dispose of the questions of State law in the light of complainant's Federal contentions"* reserving the right to go back to the Federal court, if not satisfied with the State court's ruling on the Federal issues; and

(4) Finally, plaintiff tells the State court that the college *may return there still again* if not satisfied with the Federal court's ruling on the Federal points.

Yet, now the college asks for an immediate adjudication by the Federal court.

Now opposing abstention, Sweet Briar argues that there is no ambiguity in the will or in the Virginia law necessitating an advance ruling by the State courts. Even if this contention be conceded, despite the doubt alleged of the effectiveness of the racial stipulation and the college's allegation of ambiguity in the State suit both originally and in the amendment, still the need for initial State court consideration remains. We have shown that the plaintiff must "expose", as it says, the restriction and the prohibitions to the State court under the focus of the Federal strictures upon them. In this at least the following questions seemingly need to be answered by the State court *in the light of the Federal Constitution:*

1. Whether a will made more than fifty years before the Supreme Court's racial decisions were rendered should be affected by these subsequent enunciations;

2. Whether Triplett v. Trotter, supra, decided in 1937, will still be retained by her courts as the law of Virginia in view of the racial decisions of the Federal courts since 1937;

3. Whether the testatrix included the racial stipulation in 1899 by reason of the existence of the Virginia statute or because of her own volition.[1] Cf. Justice Harlan dissenting in Evans v. Newton, 382 U.S. 296, 315, 86 S.Ct. 486, 15 L.Ed. 2d 373 (1966);

4. Whether, if the racial clause of the Williams will is held inoperative, the trust fails entirely; or can be terminated by the Virginia legislature under section

---

1. It is said that this question is foreclosed by Griffin v. State of Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964). There, however, the racial discrimination was committed by a State deputy sheriff, albeit at the instance of the proprietor of the amusement park, which undoubtedly endued the entire incident with State action. 378 U.S. at 135, 84 S.Ct. 1770. Here, the discrimination was the act of the testatrix, a private citizen.

55–34 of the Code of Virginia, 1950; or is subject to the application of the cy pres doctrine under section 55–31 of the Code; or some other disposition is proper;

5. Whether § 140 of the Virginia Constitution and § 22–221, Virginia Code, briefed by the college as unlawfully compelling racial segregation in private schools, apply to such schools; and

6. Whether the Virginia statutes pertaining to the conferring of academic degrees; exemption of property from condemnation and taxation; police protection; power of the State to abrogate the trust; and other subjects related to educational institutions, imbue Sweet Briar with a State character, as its brief suggests. These statutes appear in the Code of Virginia 1950 as the following sections: 23–9, 25–46.6, 55–34, 58–12 (reiterating here Va. Constitution § 183), 58–128, 19.1–28, 42–57 and 15.1–139.

III. The college, it is to be observed, would be the one hurt if this court entered upon a decision of this case forthwith. In reality, as we have noted, Sweet Briar has sought, and quite rightly, a judicial declaration upon the validity of the racial clause, but at this juncture this court could not give a complete answer. The reason is that the Federal court does not have the competence to do so.

At best it could only rule that the *State authorities* may not enforce the racial proviso—a narrow, negative disposition. That would not be an invalidation of the restriction for all purposes; its viability would not thereby be laid to rest. Any person in interest, such as a donor to the college, a minority member of the board of directors, or possibly others, it would seem,[2] could still question the recent action of the college as ul-

tra vires the corporation or the board, or in violation of the trust clause of the will. The college's or board's administration of the trust is always subject to the supervision of the State court. Virginia Code 1950, section 55–29, 31; Moore v. Downham, 166 Va. 77, 184 S.E. 199 (1936).

An analogy may be found in the Federal and State decisions upon the Girard will. The highest court of Pennsylvania, in In Re Girard College Trusteeship, 391 Pa. 434, 138 A.2d 844 (1958), enforced a similar racial stipulation of the Girard will after the United States Supreme Court decision had held it unenforceable by the State. Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957). In doing so the State court distinguished the case from the earlier Supreme Court decisions to which the plaintiff here looks for its thesis that the race proviso is not enforceable, e. g. Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) and Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The Supreme Court refused to disturb the second Pennsylvania case. Worth noting, too, both Pennsylvania cases reached the Supreme Court only after passing through the State courts.

In Evans v. Newton, supra, 382 U.S. 296, 300, 86 S.Ct. 486, 489 (1966), speaking for the Court Justice Douglas said:

"If a testator wanted to leave a school or center for the use of one race only and in no way implicated the State in the supervision, control, or management of that facility, we assume *arguendo* that no constitutional difficulty would be encountered."

Our citation of these decisions is not to predict the ultimate outcome of State court consideration of the instant clause,

---

2. The Virginia statute on which the plaintiff relies, § 55–29, does not vest exclusively in the Commonwealth Attorney or the Attorney General the power to enforce the terms of a charitable trust.

Indeed, it implies that there may be others who can do so. Otherwise, these officials would become the sole judges of the correctness of the trust administration.

but solely to show that its potency would still be debatable if this case were not committed for that consideration. The point is that doubt of the legal and moral right of Sweet Briar to deviate from terms of the will can plague the college until an answer is procured from the State courts. Meanwhile, the fractional decision this court is now asked to render might inadvertently mislead. The college, Government agencies, donors and students might be led to accept it as the final word on the issue, when it would not be.

For these reasons we deny at this time the relief prayed by the plaintiff. Jurisdiction of this suit will be retained but further prosecution of it will be stayed until the plaintiff exhausts the remedies available in the State courts of Virginia. In the event the plaintiff does not pursue these remedies within a reasonable time this suit will be dismissed with prejudice.

An order is today entered in accordance with the views expressed herein.

BUTZNER, District Judge (dissenting):

I regret that I cannot join my brothers' view that we should abstain. I believe the federal questions raised in this action are independent and can be decided without resolution of state issues. Even if state law plays a crucial part, the defendants' plea that we abstain overlooks the college's argument that the state law is not ambiguous, that the Supreme Court of Appeals of Virginia has construed Virginia's pivotal statute, and that its decision is binding upon this court. Under these circumstances abstention is not appropriate. Cf. Griffin v. County School Board, 377 U.S. 218, 229, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

The college may prosecute simultaneous *in personam* actions in state and federal courts until one results in a judgment which can be asserted as *res judicata* in the other. Kline v. Burke Const. Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922). Abstention cannot be predicated on the defendants' plea of *res judicata*. Section 8–99, Code of Virginia 1950, provides in part:

"In civil cases the court on motion of any party thereto shall, or of its own motion may, require the grounds of demurrer relied on to be stated specifically in the demurrer; and no grounds shall be considered other than those so stated, but either party may amend his demurrer by stating additional grounds, or otherwise, at any time before trial."

The statute applies when the demurrant states his grounds voluntarily. Virginia & S. W. Ry. Co. v. Hollingsworth, 107 Va. 359, 58 S.E. 572 (1907).

One defendant demurred on three specific state—not federal—grounds. The state judge wrote two opinions, which he incorporated in his order by reference. Sweet Briar Institute v. McClenny, No. 1383, June 3, 1965, April 6, 1966 (opinions); May 25, 1966 (order). He scrupulously observed the statutory restrictions limiting the scope of the demurrer and sustained it on state—not federal—grounds. He did not adjudicate the federal questions which the college asserts here.

The state court order sustaining the demurrer allowed the college to amend and continued the cause. The college amended, reserving for federal decision the federal questions. The order is interlocutory. § 8–462, Code of Virginia 1950; Commercial Bank of Lynchburg v. Rucker, 2 Va.Dec. 350, 24 S.E. 388 (1896). Its lack of finality renders it insufficient to sustain the defendants' plea of *res judicata*. " * * * it is familiar law that only a final judgment is *res judicata* as between the parties." G. & C. Merriam Co. v. Saalfield, 241 U.S. 22, 28, 36 S.Ct. 477, 480, 60 L.Ed. 868 (1916).

The doctrine that a decree sustaining a demurrer decides every question which the parties might have litigated and had determined is not controlling. A federal court need not abstain from deciding a federal question when the demurrer

and the interlocutory decree sustaining it are drawn to dispose of the case on state grounds only. The rule expressed in England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) does not encompass this situation.

The federal questions which must be decided are: Do the Fourteenth Amendment and the Civil Rights Act of 1964 prohibit the state from enforcing the racially restrictive provisions of a will founding a private college? By enforcing the will, can the state compel the college officials, against their judgment, to exclude students on the basis of race?

The parties accept the premise that in the absence of state action the Constitution and laws of the United States do not prohibit a person from establishing by will a private college for the benefit of one race. But when the state—and not the college—enforces racial restrictions found in a will, the impact of state action must be examined in light of the Fourteenth Amendment and the Civil Rights Act of 1964. The pivotal issue is whether the discrimination is the product of state action. Griffin v. State of Maryland, 378 U.S. 130, 138, 84 S.Ct.

1770, 12 L.Ed.2d 754 (1964) (Harlan, J., dissenting).

Consideration of the stance of the parties places the state and federal questions in perspective.

The college acknowledges that the defendants are authorized by § 55–29, Code of Virginia 1950,[1] to enforce the testamentary trust creating Sweet Briar. The college, however, asserts that the defendants, under the authority conferred by § 55–29, cannot constitutionally enforce the racially restrictive language of the will. The college insists that the state is so involved with its origin and operation that a racially restrictive admission policy is the product of state action contravening Sweet Briar's rights under the Fourteenth Amendment.

The college's primary thrust is against § 55–26, Code of Virginia 1950,[2] which it contends validates bequests and devises for racially segregated schools only and leaves invalid bequests and devises for racially integrated schools.

A brief sketch of the history of charitable trusts in Virginia illustrates the college's position. Gallego's Ex'rs v. Attorney General, 30 Va. (3 Leigh) 450,

1. Code of Virginia 1950, § 55–29. *Appointment of trustees to hold such gifts, etc.; suits by and against them; settlement of their accounts and enforcement of the execution of the trust.*—When any such gift, grant or will is recorded and no trustee has been appointed, or the trustee dies or refuses to act, the circuit court of the county or the circuit or corporation court of the city in which the trust subject or any part thereof is, in the case of a gift or grant, or in which the will is recorded, may, on motion of the attorney for the Commonwealth in such court (whose duty it shall be to make such motion), appoint one or more trustees to carry the same into execution. * * * In enforcing the execution of any such trust a suit may be maintained against the trustees in the name of the Commonwealth when there is no other party capable of prosecuting such suit. * * * "

2. Code of Virginia 1950, § 55–26. *Validity.*—Every gift, grant, devise or bequest which, since April second, eighteen

hundred and thirty-nine, has been or at any time hereafter shall be made for literary purposes or for the education of white persons, and every gift, grant, devise or bequest which, since April tenth, eighteen hundred and sixty-five, has been or at any time hereafter shall be made for literary purposes or for the education of colored persons, and every gift, grant, devise or bequest made hereafter for charitable purposes, whether made in any case to a body corporate or unincorporated, or to a natural person, shall be as valid as if made to or for the benefit of a certain natural person, except such devises or bequests, if any, as have failed to become void by virtue of the seventh section of the act of the General Assembly passed on April second, eighteen hundred and thirty-nine, entitled "an act concerning devises made to schools, academies, and colleges." Nothing in this section shall be so construed as to give validity to any devise or bequest to or for the use of any unincorporated theological seminary. (Code 1919, § 587; 1954, c. 145.)

462 (1832) held that an Act of the General Assembly (Acts of Va., ch. 79, Dec. 27, 1792) repealed, in Virginia, England's Statute of Charitable Uses (1601), 43 Eliz. 1, c. 4, which permitted such devises for educational purposes. The common law of Virginia did not recognize the validity of charitable trusts in the absence of statute. Consequently, in Literary Fund v. Dawson, 37 Va. (10 Leigh) 147 (1839), a devise for educational purposes was held invalid.

In 1839 a statute, validating devises for the education of white persons, was enacted. Acts of Va., ch. 12, April 2, 1839. Not until 1873 were devises for the education of Negroes valid. Acts of Va., ch. 263, Mar. 28, 1873. These statutes have been codified in § 55–26.

In April 1899 when the will benefiting the college was written and in 1900 when the testatrix died, the statute, for all purposes pertinent to this case, was similar to § 55–26.

The college relies upon Triplett v. Trotter, 169 Va. 440, 193 S.E. 514 (1937), as a definitive interpretation of the statute. There a will establishing an educational trust without racially restrictive language was attacked by heirs on the ground that it did not meet the requirements of the statute. The court said at 193 S.E. 515:

"On their part [the heirs] contend that the gift [for an educational institution] is not validated by this section [§ 587, the predecessor to § 55–26], because, * * * :

"* * * The will neither expressly nor impliedly shows whether the college is to be used for the education of white persons or colored persons, and such specification is required by the statute in the case of a trust for educational purposes.

* * * * * *

"* * * The will fails to specify whether the beneficiaries are white or colored persons, hence the trust is too indefinite to qualify under the statute as a gift for charitable purposes.

"With respect to their first contention appellants argue that the gift here, which is, in effect, for the purpose of aiding in the education of 'all worthy and dependent young men,' is not within the purview of section 587; that while the statute validates a gift for the 'education of white persons' or a gift for the 'education of colored persons,' as separate classes, it was not designed to validate a gift, such as this, which fails to specify which class is intended.

"* * * Admittedly the language of the statute validates a gift for the education of either white or colored persons as separate classes. Here the testator leaves to the discretion of the self-perpetuating board of trustees the selection of the 'worthy and dependent young men' who are to be admitted to the college. They may select all applicants from one class, and reject all applicants from the other. So long as the trustees do this they are certainly carrying out the provisions of the trust. And just as certainly such a trust complies with the statute because it is a gift for the 'education of white persons' or for the 'education of colored persons.'

"But it is said that the language of the will is broad enough to permit the trustees to admit to the college both white and colored persons, and that surely this was not the intention of the framers of Code, section 587. [55–26]

"The answer to this argument is that the will does not compel the trustees to make their selection from both classes. They may select applicants from either. And we have just seen that the statute validates a gift for the education of either white or colored persons as separate classes.

* * * * * *

"* * * ' "In the construction of wills the object is not to seek flaws and declare them invalid, but to sustain them if legally possible, and the presumption is that the testator in-

tended a lawful rather than an unlawful thing. Therefore, where the language used in the will is reasonably susceptible of two different constructions, one of which will defeat, and the other sustain the provisions, the doubt is to be resolved in favor of the construction which will give effect to the will, rather than the one which will defeat it." '

"Applying this principle, the trust is validated when we adopt the interpretation that the testator intended that the applicants for the college should come from one of the two classes, either white or colored, and not from both.

"We therefore reach the conclusion that the gift to establish and maintain a college for the education of such 'worthy and dependent young men' as may be selected by a board of trustees designated or provided for in the will, and as the income of the trust will permit, is on its face a valid gift for educational purposes under Code, § 587.

"Having arrived at this conclusion, it becomes unnecessary that we discuss the admissibility and effect of the extrinsic evidence offered by appellees in support of their contention that the testator intended to benefit only white 'worthy and dependent young men.' "

Bluntly stated, the college's position is that § 55–26, as construed in *Triplett,* prevents a Virginia citizen from leaving his property to establish an educational institution as he sees fit. He must leave it for the education of white students or Negro students. Regardless of his wishes, he cannot provide that his estate shall educate both white and Negro students

in the same institution. Even if his will states no preference, his trustees must elect whether the beneficiaries are to be white or Negro.

Buttressed by the interpretation placed upon § 55–26 in *Triplett,* the college relies upon Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963) and Mr. Justice White's concurring opinion in Evans v. Newton, 382 U.S. 296, 302, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), to sustain its contention that the restrictive language in the will must be deemed the product of Virginia law in effect at the testatrix's death.

As a further evidence of state action, the college points to § 140 of the Virginia Constitution [3] prohibiting integrated schools, the Sweet Briar charter granted by Act of the General Assembly [4] imposing racial restrictions in accordance with the language of the will, and miscellaneous statutes pertaining to colleges in general.[5]

Finally, the college relies upon §§ 202, 203, 204 and 207 of the Civil Rights Act of 1964.[6]

The defendants deny that § 55–26 compelled the testatrix to insert the racially restrictive provision in her will. They point out that Triplett v. Trotter, 169 Va. 440, 193 S.E. 514 (1937), was not decided until more than a third of a century after the will was written.

The defendants deny that they seek to enforce § 55–26, which they characterize as merely a declaratory statute validating charitable trusts.

The defendants assert that § 140 of the Constitution refers to public, not private, schools. They deny that the Act of the Assembly chartering the college

---

3. Va.Const. art. 9, § 140. *Mixed schools prohibited.*—White and colored children shall not be taught in the same school.

4. Va.Acts of Assembly, Extra Sess.1901, ch. 123, at 125, 128, includes a provision that the school or seminary is "to be known as the 'Sweet Briar institute,' for the education of white girls and young women."

5. Code of Virginia 1950, §§ 23–9, 25–46.-6, 58–12, 58–128, 19.1–28, 42–57, 22–221, 15.1–139, 55–27, 55–28, 55–30, 55–31, and 55–34, and Va.Const., art. 13, § 183.

6. 42 U.S.C. §§ 2000a–1, 2000a–2, 2000a–3, and 2000a–6.

and the miscellaneous statutes pertaining to colleges significantly involve the state in the affairs of the college.

The defendants characterize the will as private action founding a private college by a private individual for the members of a particular race. In urging that such a will violates no constitutional provision, they cite Mr. Justice Douglas' statement in Evans v. Newton, 382 U.S. 296, 300, 86 S.Ct. 486, 489, 15 L.Ed.2d 373 (1966):

> "If a testator wanted to leave a school or center for the use of one race only and in no way implicated the State in the supervision, control, or management of that facility, we assume *arguendo* that no constitutional difficulty would be encountered."

Although the defendants do not rely on § 140 of the Virginia Constitution or § 55–26, Code of Virginia 1950, the threat of state control over the admission policies of the college is real and imminent. After the college officials expressed their determination to admit Negroes, the Commonwealth's Attorney for Amherst County moved a state court to cite the Board of the College for contempt. In April 1966 the state court denied the motion. The state judge's opinion indicates, however, that the motion was denied because the college had not yet put into effect its proposed change in admission policy.

A state court has ruled that the language of the will is clear and unambiguous. For the purpose of this action, neither party alleges any ambiguity in the will. Both plaintiff and defendants are in agreement that the defendants are state officials charged by statute, § 55–29, with the responsibility of enforcing the trust creating the college.

The defendants, by claiming authority under § 55–29 to enforce the racial restrictions in the will without reliance upon § 140 of the Virginia Constitution and § 55–26, eliminate questions concerning the validity and application of these constitutional and statutory provisions. The defendants' position places in stark relief the federal questions that must be decided. Only if the state by enforcing the racially restrictive provisions of the will is empowered to compel the college officials against their judgment to exclude students on the basis of race need this court pursue the allegations that the racial restrictions found in the will originated in state action repugnant to the Fourteenth Amendment.

The principles governing this case have been stated by the Supreme Court of the United States in Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957):

> "Stephen Girard, by a will probated in 1831, left a fund in trust for the erection, maintenance, and operation of a 'college.' The will provided that the college was to admit 'as many poor white male orphans, between the ages of six and ten years, as the said income shall be adequate to maintain.' The will named as trustee the City of Philadelphia. The provisions of the will were carried out by the State and City and the college was opened in 1848. Since 1869, by virtue of an act of the Pennsylvania Legislature, the trust has been administered and the college operated by the 'Board of Directors of City Trusts of the City of Philadelphia.' * * *
>
> "In February 1954, the petitioners Foust and Felder applied for admission to the college. They met all qualifications except that they were Negroes. For this reason the Board refused to admit them. They petitioned the Orphans' Court of Philadelphia County for an order directing the Board to admit them, alleging that their exclusion because of race violated the Fourteenth Amendment to the Constitution. * * * The Orphans' Court rejected the constitutional contention and refused to order the applicants' admission. * * * This was affirmed by the Pennsylvania Supreme Court. [In re Girard's Estate,] 386 Pa. 548, 127 A.2d 287.

"The Board which operates Girard College is an agency of the State of Pennsylvania. Therefore, even though the Board was acting as a trustee, its refusal to admit Foust and Felder to the college because they were Negroes was discrimination by the State. Such discrimination is forbidden by the Fourteenth Amendment. * * * " [7]

Application of the holding in the Girard College case may be found in Griffin v. State of Maryland, 378 U.S. 130, 136, 84 S.Ct. 1770, 1773, 12 L.Ed.2d 754 (1964), which concerned the exclusion of Negroes from a private amusement park. The Court said:

"The *Board of Trusts* [Girard College] case must be taken to establish that to the extent that the State undertakes an obligation to enforce a private policy of racial segregation, the State is charged with racial discrimination and violates the Fourteenth Amendment."

The Supreme Court held in *Board of Trusts* that agents of the state, serving as trustees, could not constitutionally enforce the racially restrictive provisions of the will establishing Girard College. The case provides precedent for holding that state officials cannot enforce the racially restrictive provisions of the will establishing Sweet Briar College by compelling the Board, through threat of contempt, or otherwise, to admit only white students. Racial exclusion achieved by these means is the product of state action and is forbidden. Section 55–29 is not unconstitutional upon its face. However, the Fourteenth Amendment renders impermissible the use of this section to enforce racial segregation at the college.

The court must also consider the college's alternative ground for relief under the Civil Rights Act of 1964. Cf. Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); United States v. Georgia Pub. Serv. Comm'n, 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963); Florida Lime & Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960).

Pertinent sections of this Act provide:

Section 202 (42 U.S.C. § 2000a–1):

"All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a State or any agency or political subdivision thereof.

Section 203 (42 U.S.C. § 2000a–2):

"No person shall (a) withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive, any person of any right or privilege secured by section 2000a or 2000a–1 of this title, or (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten or coerce any person with the purpose of interfering with any right or privilege secured by section 2000a or 2000a–1 of this title, or (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 2000a or 2000a–1 of this title."

Section 204 (42 U.S.C. 2000a–3[a]):

"Whenever any person has engaged or there are reasonable grounds to believe that any person is about to en-

---

[7]. Upon remand, the Philadelphia County Orphans' Court substituted trustees who were not officials of the City of Philadelphia. The Supreme Court of Pennsylvania affirmed. In Re Girard College Trusteeship, 391 Pa. 434, 138 A.2d 844 (1958). The United States Supreme Court dismissed the appeal and denied certiorari, sub nom. Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 357 U.S. 570, 78 S.Ct. 1383,

2 L.Ed.2d 1546 (1958). The new trustees continued the exclusion of Negroes. The United States District Court for the Eastern District of Pennsylvania (Joseph S. Lord, III, J.) recently held that the Pennsylvania Public Accommodations Act, prohibiting racial discrimination, was applicable to Girard College. Commonwealth of Pennsylvania v. Brown, E.D. Pa., Sept. 2, 1966, 260 F.Supp. 323.

gage in any act or practice prohibited by section 2000a–2 of this title, a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved \* \* \* "

Section 207 (42 U.S.C. 2000a–6[a]):

"The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this subchapter and shall exercise the same without regard to whether the aggrieved party shall have exhausted any administrative or other remedies that may be provided by law."

The legislative history indicates that Section 202 of the Act covers any establishment or place when discrimination is state imposed. Section 202 is not limited to places of public accommodation. This limitation is found only in Section 201.

H.R.Rep.No. 914, 88th Cong., 2d Sess. pp. 2391, 2396 (1964) states:

"Section 202 requires nondiscrimination in all establishments and places whether or not within the categories described in section 201, if segregation or discrimination therein is required or purports to be required by any State law or ordinance."

The breadth of Section 202 was recognized in the Minority Report upon Proposed Civil Rights Act of 1963, Committee on Judiciary Substitute for H.R. 7152, 88th Cong., 2d Sess., pp. 2431, 2444 (1964):

"3. There was added in the reported bill section 202 which did not appear in any previous version of the bill. This section would make unlawful 'discrimination or segregation of any kind on the ground of race, color, religion, or national origin' '*at any establishment or place*,' if either purports to be required by any rule, order, etc., of any State or any agency or political subdivision thereof. This section is not limited to public places or facilities. As hereinafter pointed out, under the penal provisions of section 203, this amounts to an unconstitutional abridgement of freedom of speech, freedom of the press, and attempted Federal control of State and municipal judges and law enforcement officers."

The hallmark of Section 202 is the source of the discrimination, not the kind of establishment. The Bureau of National Affairs commented upon Section 202 in The Civil Rights Act of 1964: Text, Analysis, Legislative History (1964), 85:

"When segregation or discrimination 'is or purports to be required' by state or local law or by order of state or local officials, then Title II's prohibition comes into play regardless of the public or private character of the facility involved and regardless of the type of service it renders or the type of clientele it serves. Section 202 prohibits discrimination in 'any establishment or place' where it is required by state law. Here seems to be implementation of the Fourteenth Amendment in its fullest scope. There is no requirement that the 'place' be one of 'public accommodation,' that it be a place of business, or even that it not be a private club."

Section 202 of the Act frees the college and its students from state imposed discrimination. Section 203 forbids the defendants' attempt to punish by contempt the college officials for exercising the rights granted by Section 202. Section 204 authorizes injunctive relief. This court must exercise the jurisdiction conferred upon it even though the plaintiff may have other remedies. Section 207 expresses a Congressional command that prohibits abstention.